J-A29030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| VIOLA'S FOOD STORES, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| V3 YOGA & PILATES, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY, TRADING AND DOING BUSINESS AS TAKE YOGA, A REGISTERED FICTITIOUS NAME OF V3 YOGA & PILATES, LLC, AND ALSO TRADING AND DOING BUSINESS AS, CROSSFIT NORTH PARK, AN UNREGISTERED FICTITIOUS NAME, | |
| Appellee | No. 1930 WDA 2014 |

Appeal from the Order October 28, 2014
In the Court of Common Pleas of Allegheny  County
Civil Division at No(s): GD 14-001816

BEFORE:  FORD ELLIOTT, P.J.E., BOWES AND MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                      **FILED JANUARY 12, 2016**

Viola's Food Stores, Inc. ("Viola's") appeals the October 28, 2014 order denying it a preliminary injunction.[1]  We affirm.

On February 6, 2014, Viola's instituted this action seeking an injunction, ejectment, and damages against Appellee, V3 Yoga & Pilates, LLC, a Pennsylvania limited liability company, trading and doing business as

---

[1] An order denying a preliminary injunction is appealable pursuant to Pa.R.A.P. 311(a)(4).

Take Yoga, a registered fictitious name of V3 Yoga & Pilates, LLC, and also trading and doing business as Crossfit North Park, an unregistered fictitious name ("V3"). Viola's owned Duncan Manor Shopping Center ("Duncan Manor"), which is located at 1701 Duncan Avenue, McCandless Township. On November 20, 2012, Viola's executed a ten-year lease with V3 for Suites 15 and 16 of Duncan Manor. The lease contemplated that V3 would build and operate a fitness center at that location. Thereafter, V3 expended in excess of $500,000 to build the facility. There was an addendum executed to the lease after V3 assumed occupancy of the two suites.

Viola's claimed that V3 was in material breach of the lease, and it sought injunctive relief in the form of the immediate removal of V3 from Duncan Manor. To obtain the injunction, Viola's raised allegations that V3 violated the lease in three respects: 1) V3 was creating noise that disturbed other tenants; 2) V3 had deliberately opened a gap in a demising wall in order to steal heat from another tenant and that gap created a highly hazardous condition; and 3) the building permit that V3 used to construct its fitness center was invalid.[2] Demising walls separate one tenant's space from that of another tenant, in contrast to interior walls built to create the space necessary for a business to operate.

_____

[2] In the complaint, there was an allegation that V3 breached the lease by complaining about a lack of heat to its facility. That averment was not advanced at the hearing.

The question of whether Viola's was entitled to the requested injunctive relief, *i.e.*, V3's immediate removal from its suites at Duncan Manor, proceeded to a hearing on March 28, 2014. The following evidence was adduced as to Viola's position that V3 breached the lease by conducting loud activities. On January 29, 2014, Viola's received a grievance from V3's adjacent tenant, a PennDot Drivers Licensing Center, ("PennDot"), that its customers could hear loud music and vulgar language emanating from V3.

The fact that V3's customers and music could be heard by PennDot breached a section of the lease entitled "Use of Premises." Therein, V3 agreed to prevent the "premises from being used in any way which . . . may be a nuisance, annoyance, inconvenience or damage to the other tenants of such building or of the neighborhood, including, without limiting the generality of the forgoing, noise." Complaint, 2/6/14, at Exhibit 1.

Viola's immediately transmitted notice of the lease violation to V3. On January 30, 2014, the day after being notified about PennDot's complaint, Paul J. Stugart, V3's founder and chief executive officer, responded that it would adjust the music level and notify its customers to refrain from using vulgar language. Thereafter, Viola's did not receive any further complaints from PennDot as to noise.

Relevant herein is the fact that the lease gave V3 thirty days to cure any breach of its provisions before Viola's could terminate V3's tenancy. It set forth at Article XXI that, if any lease default "shall continue for a period

of more than thirty (30) days after notice therefore given in writing to Lessee by Lessor then the Lessee does hereby authorize and fully empower said Lessor, to cancel and annul this Lease at once[.]" *Id*.

Viola's second breach allegation concerned the demising wall that separated V3 from PennDot, which had a three to four inch gap between the top of the wall and the ceiling. Viola's suggested that the lease and addendum required V3 to not only build the interior walls creating the contours of the fitness center, but also mandated that V3 construct and maintain any demising wall between V3's fitness facility and the space occupied by any adjoining tenant.

Viola's further claimed that there was not a gap in any demising wall separating V3's suites from other tenants when V3 started to occupy the premises and that the wall was sealed to the ceiling as of July 13, 2013. It accused V3 of deliberately opening the space in the demising wall to pirate heat from the adjacent tenant. Viola's suggestion that the gap was created after V3 occupied the suites was premised upon one fact, which was that V3 obtained an occupancy permit on October 15, 2013, after it assumed control over the two suites. Viola's maintained that, since a demising wall gap constituted a violation of the applicable building and fire codes, the occupancy permit would not have been issued if there had been a gap in a demising wall. Finally, Viola's argued that the hole in the demising wall created such an extremely hazardous condition that V3's thirty-day ability to

cure the defect was obviated and required V3's immediate removal from Duncan Manor.

As to the demising wall, V3 first countered that it was not responsible under the lease for fixing any gap in the demising wall. It relied upon Article X of the lease, which provided that Viola's was responsible for maintaining the "slab and foundation" and was required to "make structural repairs in the interior of the premises." Further, the lease outlined that V3 only was to perform interior drywall work in the suites that it leased; demising walls were not mentioned as part of V3's obligations under the lease.

V3 also presented evidence that it did not create the gap in the demising walls surrounding its premises and, instead, that the opening between the ceiling and top of the demising wall was in existence when it assumed occupancy of the premises. McCandless Township Fire Marshal, Dan Stack, testified at the hearing that the gap in the wall was an existing condition, was not a violation of the fire code, and was minor. V3 also presented as a witness a McCandless Township building inspector, Jeff Frazier, who confirmed that the gap in the demising wall between PennDot and V3 was minor and would not have affected the issuance of an occupancy permit.

Viola's final position was that V3 breached the lease because the building permit that it procured to improve the suites was void. Specifically, it claimed that the permit was invalid because Flynn Construction

Management ("Flynn") was listed as the general contractor on the building permit, but Mr. Stugart, rather than Flynn, operated as general contractor for the work.

V3 responded with testimony from James Gordon, the Director of Business Development for Flynn. Mr. Gordon reported that Flynn allowed its name to be submitted by owners for building permits even prior to executing a contract and also allowed its name to be used even if it did not ultimately serve as general contractor on the project. V3 also offered proof that its architect contacted Flynn so that a building permit could be secured and that a Flynn employee gave the architect Flynn's information so that a permit could be obtained. Mr. Frazier told the court that it is not unusual for an owner to change the name of the contractor listed on the building permit application after the application was issued. Mr. Frazier stated that V3's building permit was valid.

There are two additional facts pertinent herein. First, Mr. Stugart testified that V3 had expended in excess of $500,000 to improve Suites 15 and 16 and that, if forced to vacate those premises, V3 would go bankrupt. Additionally, Viola's was negotiating to lease space to an entity that was a direct competitor of V3. Article VIII of the lease prohibited Viola's from renting any space within Duncan Manor to any business that was similar to the business of V3.

After the hearing, the trial court specifically credited the witnesses presented by V3, and it denied the injunction. The court found that Viola's was not likely to prevail on its claims that V3 was in breach of the lease, that Viola's had failed to prove that it would sustain any type of harm from V3's continuing occupancy of its fitness center, and that V3 would suffer more harm from the grant of an injunction immediately removing it from Duncan Manor than Viola's would suffer if V3 was permitted to stay. This latter finding was premised upon V3's expenditure of a vast sum to improve the suites and the fact that it would go bankrupt if it could not use them.

In this appeal, Viola's presents these issues:

1. Did the Court err when it held that Viola had presented no evidence of any V3 conduct that breached the lease, when Viola proved that V3 stole the identity, workers compensation and taxpayer identification number of Flynn Construction Management in order to secure the building permit for the tenant's work in the premises, and as the result of V3's failure to use a qualified general contractor, V3 left the fire partition unsealed, in violation of V3's duty under the lease to construct the walls in the premised in compliance with applicable law?

2. Did the Court err in holding that Viola proved no evidence of any harm when Viola proved that V3 left the fire partition unsealed, which Viola proved is a life safety hazard to Viola and its tenants?

Appellant's brief at 4.

Initially, we set forth our standard of review:

[Appellate] review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential." **Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount Inc.**, 573 Pa. 637, 828 A.2d 995, 1000 (2003). This "highly deferential" standard of review states that in reviewing the grant or denial of

- 7 -

a preliminary injunction, an appellate court is directed to "examine the record to determine if there were any apparently reasonable grounds for the action of the court below." *Id.* We will find that a trial court had "apparently reasonable grounds" for its denial of injunctive relief where the trial court has properly found "that any one of the following 'essential prerequisites' for a preliminary injunction is not satisfied." *Id.* at 1002.

*Warehime v. Warehime*, 860 A.2d 41, 46 (Pa. 2004) (footnotes omitted).

A preliminary injunction will not be granted unless the party seeking the injunction establishes six essential elements. *Id*. Specifically, that party has the burden of proving

> 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) that a preliminary injunction will not adversely affect the public interest.

*Id*. at 46-47 (quotation marks and citation omitted).

Viola's first position is that the building permit was fraudulent.[3] It notes that V3 placed Flynn on the permit as the proposed general contractor

_____

[3] We note that Viola's overreaches by suggesting that the permit was forged. Appellant's brief at 13 ("Forgery related to a building permit falls within the felony three class of writings" under the Crimes Code.); *Id*. at 15. The permit was not forged. V3's architect asked Flynn for its information to
*(Footnote Continued Next Page)*

and argues that, since Flynn did not perform the construction work, the "actual construction violated the building permit." Appellant's brief at 13-14. It suggests, "Thus, the Trial Court should have granted injunctive relief [to] remedy the illegal construction installed by V3." Appellant's brief at 14.

The first flaw in this position is the trial court credited V3's proof that the building permit was valid.[4] The second fatal defect in Viola's position is that it has failed to present any argument as to the existence of harm to **it** as result of the use of Flynn's name on the permit. Viola's simply suffered no injury due to the construction work performed by V3 pursuant to the building permit.

The cases upon which Viola's relies remedies the issuance of an invalid permit by enjoining the work performed pursuant to it. *Upper Moreland Twp. v. Meade*, 218 A.2d 271 (Pa. 1966) (upholding an order enjoining construction that was being performed in violation of the plans upon which a building permit was issued); *City of Philadelphia v. Wyszynski*, 112 A.2d 327 (Pa. 1955) (affirming issuance of injunction sought by municipality

_(Footnote Continued)_ ─────────────────

obtain a building permit, and one of Flynn's employees, who no longer worked for the company when the hearing transpired, gave the architect the information for that purpose. There was no proof of forgery.

[4] Evidence concerning the validity of the building permit was presented to the trial court and briefed in connection with the request for issuance of the preliminary injunction. Hence, we do not believe that this position is waived, as suggested by V3.

against business that was being operating in violation of zoning law where false statements were made to secure permit to operate business).

Herein, Viola's never sought that type of injunctive relief in the trial court; it never sought removal of the improvements made with the building permit. On appeal, Viola's does not cite a lease provision that was breached due to the use of Flynn's name. Viola's does so now, arguing that the "only remedy for illegal construction is for this Honorable Court to enjoin the construction, and, in effect, to revoke both the false building permit and the occupancy permit." Appellant's brief at 18. In the trial court, Viola's sought to have V3 removed as a tenant based upon breach of the lease as opposed to having the construction enjoined and revocation of the permits in question. Hence, this request for relief is waived. Pa.R.A.P. 302(a) (issues not raised in the trial court are waived for purposes of appeal).

In its second issue, Viola's attempts to prove the existence of harm to it by suggesting that the gap in the demising wall created a hazardous condition on its premises. It insists that it "proved that V3 left the fire partition unsealed" and that the condition was "a life safety hazard" to it and its tenants. Appellant's brief at 16. In this respect, Viola's completely ignores the trial court's findings, which were firmly premised upon V3's proof. Specifically, the gap was in the demising wall existed when V3 assumed occupancy of the premises and that **the lease** did not require V3 to fix the problem. Instead, the lease placed the obligation for internal

structural repairs on Viola's. Thus, even though V3's architectural plans for its construction project did provide for the gap to be patched, V3 was not in violation of the provisions of the lease due to the existence of the gap.

Additionally, Viola's overlooks the fact that, even if V3 was required under the lease to fix the opening in the demising wall, the lease required Viola's to give notice to V3 of this defect and to offer V3 thirty days to cure the breach by fixing the gap in the demising wall. Additionally, Viola's completely disregards the proof, which was credited by the trial court, that the hole in the demising wall was a minor problem that did not create an extremely hazardous safety condition. Thus, Viola's second position fails.

We also observe the following. At no point in its brief does Viola's address the trial court's finding that V3 would suffer greater harm from issuance of the injunction than Viola's would suffer if the injunction was denied. This finding was firmly premised upon proof that V3 expended over $500,000 to create the fitness facility and that it would go bankrupt if removed from the premises. That finding, standing alone, provides apparently reasonable grounds for denial of the injunction and requires us to affirm. ***Wareheimer***, ***supra***.

Finally, we note that Viola's utterly failed to establish an essential prerequisite for grant of injunctive relief: that it is likely to prevail on the merits. Viola's sought to cancel its ten-year lease with V3 and the immediate ejectment of its tenant based on three purported breaches of the

lease: the noise, the gap in the demising wall, and the building permit's erroneous listing of Flynn as general contractor. The noise was abated within the thirty days permitted under the lease. Viola's failed to establish that V3 had to repair the demising wall under the terms of the lease, and it failed to offer V3 thirty days to remedy the opening in the demising wall, to the extent V3 had that responsibility Violas cannot, under the clear terms of the lease, cancel that document without proffering V3 an opportunity to cure a breach. Viola's does not point to any language in the lease that would warrant a finding that the document was breached by the fact that the general contractor listed in the building permit did not operate as such. For that additional reason, we also affirm.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/12/2016</u>