J-A06035-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BRIAN & CHRISTY MILLARD, HUSBAND AND WIFE, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellees | : | |
| | : | |
| v. | : | |
| | : | |
| REA ENERGY COOPERATIVE INC., | : | |
| | : | |
| Appellant | : | No. 981 WDA 2017 |

Appeal from the Order Entered June 19, 2017
in the Court of Common Pleas of Cambria County
Civil Division, at No(s): 2017-1805

BEFORE:  BENDER, P.J.E, SHOGAN, and STRASSBURGER,* JJ.

MEMORANDUM BY:  STRASSBURGER, J.  **FILED APRIL 9, 2018**

REA Energy Cooperative, Inc. (REA) appeals from the June 19, 2017 order that granted the petition for special relief in the form of a preliminary injunction filed by Brian and Christy Millard (the Millards, collectively), precluding REA from expanding its existing easement on the Millards' land beyond 30 feet.  We affirm.

REA's power lines cross land owned by the Millards, which the Millards purchased in 2003.  REA maintains the area surrounding the lines to keep it clear of growing tree limbs and debris, but has not substantially altered the width of the right-of-way in the time of the Millards' ownership of the property.  In January 2017, REA's representative informed the Millards of REA's desire to clear trees to expand the right-of-way to 40 feet.  The Millards objected,

_____

* Retired Senior Judge assigned to the Superior Court.

and, after attempts to reach an agreement about the removal of trees failed, the Millards filed petitions for preliminary and permanent injunctions.

The trial court held a hearing on the request for a preliminary injunction on June 16, 2017. Testimony was offered by Brian Millard; Pat McAndrew, REA's manager of engineering; and Brendan Short, a forestry supervisor for REA. The parties also offered various exhibits, including photographs of the land, easement documents, and REA documents concerning membership and by-laws.

On June 19, 2017, the trial court issued findings of fact and an order. In the former, it determined that: (1) the current width of the right-of-way is 30 feet (15 feet on either side of the line of poles supporting the power lines); (2) the Millards seek to prevent REA from expanding the easement to 40 feet (an additional five feet on each side); and (3) the Millards presented sufficient evidence to obtain a preliminary injunction. Findings of Fact, 6/16/2017. Accordingly, the trial court granted the Millards' petition to prevent REA from expanding the width of the easement unless a written agreement of the parties or court order provides otherwise, and ordered that REA's maintenance of the current 30-foot-wide easement must be "performed as minimally invasive as practicable." Order, 6/19/2017.

REA timely filed a notice of appeal, and both REA and the trial court complied with Pa.R.A.P. 1925. REA presents this Court with two questions: (1) whether the trial court erred in concluding that the Millards are likely to

prevail on the merits of their claim based upon (a) the easement agreement which REA requires its members to enter into, and (b) McAndrew's testimony that a 40-foot-wide easement is reasonable and necessary; and (2) whether the trial court erred in failing to find that granting the preliminary injunction will cause substantial harm to REA and the individuals who obtain electrical service through REA's lines. REA's Brief at 5-6.

> [R]eview of a trial court's order granting or denying preliminary injunctive relief is highly deferential. This highly deferential standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to examine the record to determine if there were any apparently reasonable grounds for the action of the court below.

*Warehime v. Warehime*, 860 A.2d 41, 46 (Pa. 2004) (internal citations, footnotes, and quotation marks omitted). Our scope of review is plenary. *Id.* at 46 n.7.

With these standards of review in mind, we have reviewed the certified record and the parties' briefs. This review has revealed that the trial court's September 12, 2017 opinion adequately addresses and properly rejects the issues REA raises on appeal. *See* Trial Court Opinion, 9/12/2017, at 8-10 (discussing evidence that showed the easement historically has been 30 feet wide; that McAndrew, who opined that a 40–foot-wide easement was necessary, was not credible in light of credible evidence that there had never been a problem with the lines before and there were presently no dead or dying trees threatening the lines; and that the Millards never saw, let alone

- 3 -

executed, an easement agreement that provided a 40-foot-wide right-of-way); *id.* at 11 (noting that the record did not support REA's contention that granting the injunction would substantially harm its customers, as with the injunction at 30 feet wide REA was still permitted to clear parts of trees that had grown into the power lines, and there was no indication that the risk of a tree on the Millards' property damaging a power line would be decreased by widening the right-of-way by five feet on each side).

Because the trial court has offered reasonable grounds for its decision, REA has failed to convince us that the trial court erred and it is entitled to relief. We therefore adopt the trial court's opinion in affirming the June 19, 2017 order. The parties shall attach a copy of the trial court's September 12, 2017 opinion to this memorandum in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 4/9/2018

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CIVIL DIVISION

BRIAN & CHRISTY MILLARD,
Husband and Wife,          :      Trial Court No. 2017-1805

            Plaintiffs,     :      Superior Court No. 981 WDA 2017

     vs.

REA ENERGY COOPERATIVE, INC.,     :

            Defendant.     :

**********

ATTORNEYS OF RECORD:

     For the Plaintiffs:      JEFFREY MILLER, ESQ.
                               ANDREW SCHELLHAMMER, ESQ.

     For the Defendant:      JESSE DANIEL, ESQ.

**********

## OPINION IN SUPPORT OF ORDER PURSUANT TO PENNSYLVANIA RULE OF APPELLATE PROCEDURE 1925(a)

BERNSTEIN, J., September 12, 2017. Pursuant to Pennsylvania Rule of Appellate Procedure Rule 1925(a), the trial court submits the following Opinion in Support of Order dated June 19, 2017:

### BACKGROUND

Plaintiffs, Brian and Christy Millard (the "Millards"), filed a Complaint for Permanent Injunction on May 10, 2017. On May 12, 2017, the Millards filed a Petition for Special Relief in the Form of a Preliminary Injunction. Then, on May 16, 2017, Judge Fleming of the Cambria County Court of Common Pleas issued an *ex parte* Order grating the Preliminary Injunction. A hearing was scheduled for June 16, 2017 where both parties could be present

and present evidence and argument to the trial court with regard to the preliminary injunction. Said hearing was held on June 16, 2017 before this trial court at which time the following was developed through evidence and testimony.

The Millards purchased their residence and the other parcels of property at issue here in 2003. N.T. 6/16/2017, pg. 7. Millard testified that the same lines exist on his property as did in 2003. *Id.* at 8. The area surrounding the power lines had also been cleared to create a right-of-way which, as it existed at the time of hearing, was substantially similar to the right-of-way as it existed in 2003. Millard stated that the only change over his fourteen years of ownership is that the trees on the edge of the right-of-way have "grown to some extent." *Id.*

Defendant, REA Energy Cooperative, Inc. ("REA"), first visited the property while owned by Millard in either 2008 or 2009. *Id.* at 9. During that first visit, REA's contractor trimmed some of the trees at the edge of the existing right-of-way, cleared debris, and chipped the resulting materials. *Id.* at 11. REA's contractors returned approximately three or four years after the first visit and Millard testified that REA was not concerned with the "walls" of the right-of-way (the trees and branches encroaching from the vertical sides of the right-of-way), but only discussed and removed growth on the "floor" of the right-of-way (trees and secondary growth below the power line). REA did not discuss the possibility of widening the existing right-of-way during this visit. *Id.* at 12.

Finally, an REA representative visited Millard's residence for a third time in January of 2017, talked to Christy Millard, and requested permission to perform line-clearing maintenance. *Id.* However, Christy Millard refused to give permission and directed REA to contact her husband Brian Millard ("Millard.") *Id.* at 13. Millard testified that REA never did make contact before Christy Millard came home 2-3 months later to find REA's contractor in

the process of trimming the trees that she had previously refused to give permission to trim. *Id.* Christy Millard directed REA's contractors to cease their work and the Millards set up a time to meet with REA's Forester, Brendan Short (the "Forester").

The Forester came to the Millards' property approximately a month later and marked the trees that he proposed to remove with white paint. *Id.* at 15. Upon arriving to meet the Forester and seeing the painted trees, Millard became upset at the number of trees that the Forester wanted to remove. He testified that he was told by the Forester or the other man accompanying the Forester that, "anything with white paint on it was going to be removed and [REA] could take more if [Millard] didn't like it." *Id.* Millard and the Forester attempted to come to a mutually agreeable solution while walking the property near the power lines and right-of-ways. Millard stated that the existing right-of-way did not have a consistent width and varied from approximately 25 to 35 feet wide. *Id.* at 16. Millard hoped to convince REA to only trim the existing trees rather than removing entire trees since the proposed expansion of the right-of-way width to 40 feet from 30 feet (an additional 5 feet on both sides of the power line) would result in the loss of 30 to 35 "major" trees. *Id.* at 21. REA's Forester estimated these trees to be 25-30 years old. *Id.* at 61. Millard and REA were not able to reach an agreement and the instant Petitions for Permanent and Preliminary Injunctions, respectively, resulted. Millard concluded his testimony by stating that he cannot recall a time, during the approximately fourteen years that he has owned the property at issue, where REA had to come to his property to repair the lines from damage caused by falling or overgrown trees. *Id.* at 21.

Next, Pat McAndrew ("McAndrew"), REA's Manager of Engineering, testified that it was his opinion, after being qualified as an expert in the field of electrical engineering in the

operation and maintenance of an electrical distribution system, that the width of the right-of-way on Millard's property necessary to safely and reliably operate the lines is 40 feet. *Id.* at 27. McAndrew also stated that the National Electric Safety Code's ("NESC") formula would dictate a minimum clearance of 13.3 feet on either side of the power lines on Millard's property (26.6 feet of total right-of-way). *Id.* at 31. He went on to explain that the NESC "is an organization where utilities from all around the country gather in community forum to develop safety standards and guidelines for electric utilities to follow." *Id.* However, McAndrew maintained his opinion that 40 feet was the proper minimum clearance on Millard's property. McAndrew cited the use of 30, 40, and even 50 foot minimum clearances used by other utility companies to support his position.

McAndrew also had occasion to inspect Millard's property and testified to his specific recollections and recommendations that resulted. First, McAndrew noted that he viewed multiple problems that could result in a blowout. First, he testified that he saw, "Conductor clearances that are far too close to vegetation or growth. [McAndrew] actually saw evidence of tree limbs that were actually burnt from the contact with the electric line." *Id.* at 33. McAndrew next testified that he "saw several trees that appeared to be dying." *Id.* at 34. He noticed dying trees both within the 40 foot proposed right-of-way as well as outside of the 40 feet that he believed could fall on the power lines. *Id.* However, REA's Forester testified that he had also inspected the property and none of the trees were dead, dying, or diseased. *Id.* at 53. The Forester again contradicted McAndrew by testifying that although there were trees that he considered "dangerous" within the 40 foot area, none of the trees outside of the 40 foot area should be considered "dangerous." *Id.*

McAndrew concluded his testimony by describing a limited number of instances in which trees and/or power lines have come down and caused either the death of wild animals in the vicinity or injury to REA employees who were attempting to clear a tree from a power line. Even so, McAndrew did admit on cross-examination that cutting an additional five feet on each side of the existing right-of-way would not eliminate the danger of trees falling and damaging the power lines. *Id.* at 48-49.

The parties also marked and admitted numerous exhibits at hearing. First, REA admitted Defendant's Exhibit #1 ("D-1"), a copy of the Millards' Application for Membership and for Electric Service dated September 23, 2003. The Application for Membership, signed by Christy Millard, states in relevant part at paragraph 8,

> By executing this application, Applicant hereby grants the Cooperative such easements upon, over or under the Applicant's lands for purposes of erecting, maintaining, repairing and servicing all such pole lines, facilities and equipment as may be necessary and convenient in order to provide electric service to the Applicant. Applicant hereby agrees to execute, acknowledge and deliver to the Cooperative a Right-of-Way Easement to provide electric service to the Applicant in such form as may from time to time be used by the Cooperative, a copy of which shall be available at the office of the Cooperative.

D-1. Next, REA marked and admitted Right-of-Way Easements executed by the previous owners of the Millards' property. Both Right-of-Ways contained identical language:

> . . . to place, construct, operate, repair, maintain, relocate and replace thereon and in or upon all streets, roads or highways abutting said lands an electric transmission or distribution line or system, and to cut and trim trees and shrubbery to the extent necessary to keep them clear of said electric line or system and to cut down from time to time all dead, weak, leaning or dangerous trees that are tall enough to strike the wires in falling.

D-2, D-3. However, the word "relocate" was stricken from the document marked as D-2. A similar Right-of-Way Easement was never signed by the Millards and these Easements were not mentioned in the recorded deed, but Millard did state that he was aware of electrical

utilities on the property at the time it was purchased. REA also marked and admitted a summary of the property in question's ownership and the corresponding deeds. D-6. Finally, REA marked but did not move for admission of a copy of the current Right-of-Way Easement kept at the REA office (D-6) and a copy of the REA by-laws (D-5). The by-laws state that,

> Each member agrees to execute, acknowledge and deliver to the Cooperative a Right-of-Way Easement to provide electric service to any members in such form as may from time to time be used by the Cooperative, a copy of which shall be available at the office of the Cooperative.

D-5. The Millards marked and admitted six photographs and a video showing the property from various vantage points which illustrated the size of the currently maintained easement, the current state of the trees, and the layout of the property. After hearing and review of all evidence presented, the trial court granted the Millards' Petition for Preliminary Injunction.

On July 3, 2017, REA filed a timely Notice of Appeal to the Superior Court of Pennsylvania, appealing the Court's Order dated June 19, 2017. NOTICE OF APPEAL FILED FOR RECORD ON JUNE 19, 2017. On July 14, 2017, the Court issued an Order under Pennsylvania Rule of Appellate Procedure 1925(b), directing Defendant to file a Concise Statement of Errors Complained of on Appeal ["Concise Statement"]. ORDER DATED JULY 14, 2017. REA's Concise Statement raises two allegations of error:

1) Did the Court err in finding that Plaintiffs Brian and Christy Millard proved that they are likely to prevail on the merits?

2) Did the trial court err in when it found that the requested preliminary injunction will not inflict a greater injury on, or substantially harm, REA and the general public, generally, and specifically in that the testimony of record established that the infrastructure in question provides electrical service to 422 other individuals, some of whom have special needs, and the reasonable and necessary clearance width needed to safely and reliably operate the infrastructure is 40 feet, that being 20 feet on either side of the infrastructure?

For the reasons discussed herein there is no merit to this allegation of error and the appeal should be denied and the Court's order affirmed.

## DISCUSSION

Where a preliminary injunction is sought, the burden is on the party who requested preliminary injunctive relief to show that six elements are satisfied:

1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;

2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings;

3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;

4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, that it is likely to prevail on the merits;

5) that the injunction it seeks is reasonably suited to abate the offending activity; and

6) that a preliminary injunction will not adversely affect the public interest.

*Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 249 (Pa. Super. 2013). In the case at hand, REA challenges the trial court's findings that two of the elements listed *supra*, #2 and #4, have been met.

**I.      Did the Court err in finding that Plaintiffs Brian and Christy Millard proved that they are likely to prevail on the merits?**

REA's first allegation of error is that the trial court erred by finding that the Millards met part of the fourth element – that the Millards are likely to prevail on the merits. To demonstrate likely success on the merits, the proponent of the preliminary injunction need only establish a *prima facie* case to relief. *Id*. *Prima facie* is defined as, "sufficient to establish a fact or raise a presumption unless disproved or rebutted." *Prima Facie*, BLACK'S LAW DICTIONARY (9th ed. 2009).

Underlying the preliminary injunction at issue here, the Millards have filed a Complaint for Permanent Injunction whereby REA would be enjoined from removing trees outside of the alleged historically maintained 30 foot easement. In order to obtain permanent injunctive relief, a party must establish the following elements relative to their claims: (1) the right to relief is clear, (2) the injunction is necessary to avoid an injury that cannot be compensated by damages, and (3) that greater injury will result if the court does not grant the injunction than if it does. *Mazin v. Bureau of Prof'l & Occupational Affairs*, 950 A.2d 382, 389 (Pa. Commw. Ct. 2008).

Here, the Millards demonstrated through testimony and evidence presented at hearing that they are likely to prevail on the merits of their underlying Complaint for Permanent Injunction. That is, they established a *prima facie* case for relief. The evidence presented proves that REA at least has a prescriptive easement. However, a prescriptive easement would only be limited to the width at which REA has maintained in the past – approximately 30 feet. There was no evidence presented by REA to contradict the assertion that the easement has always been maintained at approximately 30 feet at most locations on the Millard's property.

Evidence also shows that the Millards signed an REA Membership Agreement whereby they granted REA such easements "as may be necessary or convenient" to provide

electricity and maintain the lines. D-1. Previous owners of the Millards' property had executed Right-of-Way Easements that granted REA an easement "to the extent necessary" to keep the lines clear of trees and other debris. D-2, D-3. Millard testified that, for the approximately 14 years that he has owned the property, there has never been a problem with the power lines caused by trees on his property while the easement has been maintained at 30 feet. Thus, the Millards made a *prima facie* showing that the easement as it has historically existed, and being necessary for the maintenance of the lines, is 30 feet in width.

Furthermore, REA's expert, Pat McAndrew ("McAndrew") testified that the NESC formula, adopted and utilized by power companies all over the country, recommended 13.3 feet as the minimum clearance on either side of the lines on the Millards' property (a total of 26.6 feet). However, McAndrew testified that he would recommend 20 feet of clearance on either side of the line (total of 40 feet). He also testified that he inspected the Millard property and viewed dead and dying trees both within and outside of the recommended 40 foot easement. REA's Forester and second witness then contradictorily testified that he viewed the Millards' property and there were no dead or dying trees. Thus, the trial court gave little weight to McAndrew's opinion that 40 feet was necessary where the NESC recommended a minimum of 26.6 feet instead of 40 feet and since McAndrew's recollection and description of the actual conditions of the trees on the Millards' property directly contradicted the testimony of REA's Forester.

Finally, REA provided its by-laws, the Membership Agreement, and a blank copy of a Right-of-Way Easement which listed a 40 foot easement. REA first argued that 40 feet was necessary to maintain the lines and second that the Millards in some way must be bound by the unexecuted Right-of-Way Easement since they signed a Membership Agreement. REA

alleges that by signing the Membership Agreement, the Millards agreed to execute the Right-of-Way Easement located at the REA office and any future iterations of said Right-of-Way Easement (without ever viewing the original Right-of-Way Easement located at the REA office or being aware of later versions of such which may have included an expanded easement of 40 feet). The trial court found REA's argument that the Millards are bound by an unexecuted Right-of-Way (which lists a 40 foot wide easement and that the Millards have not seen) to be unpersuasive. REA provided no support for its assertion that, by executing an agreement in which the Millards agreed to later execute a non-descript easement, somehow a 40 foot easement was granted to REA. Thus, the trial court found that the Millards made a *prima facie* showing that a 30 foot easement historically existed and is necessary to maintain the lines, thereby finding that REA had no right to extend the easement to 40 feet.[1]

## II. Did the trial court err when it found that the requested preliminary injunction will not inflict a greater injury on, or substantially harm, REA and the general public?

REA's next allegation of error is that the trial court erred in finding that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. REA presented testimony at hearing that the lines passing through the Millards' property serviced 422 other individuals and that one of those individuals has medical devices hooked up to electricity that are critical to his or her survival while thirteen other individuals have requested that they be notified when REA has a planned power outage so that they can prevent things like food spoilage due to lack of electricity. REA presented further testimony

---

[1] As to the second and third elements required for a permanent injunction, Millard testified that the trees are large and mature and could not be replaced in his lifetime and the third element – the extent of harm that would be caused whether the injunction is granted or denied – will be discussed *infra*.

describing previous times at which trees had fallen on power lines (not on the Millards' property) and the injuries that resulted. REA's witness testified that REA employees or contractors had been injured when attempting to cut a fallen tree out of a power line and animals have been killed as the result of fallen trees and downed power lines. On the other hand, Millard and REA's Forester testified that the trees that would be removed if the easement was extended were approximately 25-30 years old and numbered between 30-35. If these trees were removed they would not be easily replaced as they are mature trees that have taken decades to grow to their present size.

The trial court considered the testimony, evidence, and argument of parties and determined that the injury that would result from refusing the injunction would be greater than that which would result from granting the same. Furthermore, REA failed to prove that granting the injunction would substantially harm other interested parties. It is undisputed that 422 individuals are serviced by the lines on the Millard's property and that injuries have occurred in the past when trees have fallen on power lines. However, REA failed to show a correlation between an increased risk of such occurrences and the extension of the easement from 30 feet to 40 feet. That is, REA did not prove that the risk of damage to power lines by trees would be decreased by extending the right-of-way by five feet in both directions. It is important to note that REA would be permitted to clear at least 30 feet whether the injunction was granted or denied. McAndrew testified that trees were touching the power lines and burning. Whether the trial court granted or denied the injunction would have no effect on REA's ability to clear those trees whose branches were so close to the lines that they became scorched and that presented clear and imminent danger. Thus, because REA presented no credible evidence or testimony to show that an additional 10 feet of clearing would decrease

the chances of trees falling on the power lines, the denial of the injunction and subsequent removal of the tress at issue would cause greater injury than granting the injunction and prohibiting REA from clearing an additional ten feet of trees. The trial court recognizes that the injuries associated with downed trees and power lines can be serious, but REA did not show that the risk of such would be mitigated by further clearing.

## CONCLUSION

For the reasons set forth above, the Court of Common Pleas' Order dated June 19, 2017 should be affirmed.

RESPECTFULLY SUBMITTED,

Tamara R. Bernstein, J.