860 A.2d 41

**Michael WAREHIME, Appellee**

v.

**John A. WAREHIME, Appellant.[1]**

Supreme Court of Pennsylvania.

Argued May 13, 2003.

Decided Oct. 20, 2004.

---

1. We note that in his caption to his Petition for Allowance of Appeal ("PAA") to this Court, John Warehime indicated that both he and the "Independent Directors Committee" were petitioners. After grant of allocatur in this matter, the caption read that this was an appeal of "John A. Warehime and Independent Directors Committee". Such a caption is incorrect. Our review of the extensive docket in this matter reveals that the Independent Directors Committee was not named as a defendant in Michael Warehime's Motion for Preliminary Injunction. Nor can we find any evidence that the Independent Directors Committee was ever joined as a third party defendant or that it filed a request for and was granted leave to intervene. Accordingly, since the Independent Directors Committee is not a party to this action, it will not be included in the caption as an appellant.

Joseph C. Korsak, York, for J. Warehime, appellant.

Grant Stearns Palmer, Matthew J. Siembieda, David F. Girard diCarlo, Philadelphia, for Independent Directors Committee.

Patricia Proctor, Alfred W. Putnam, Stephen Burke Schott, Philadelphia, for M. Warehime, Appellee.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR and LAMB, JJ.

## OPINION

Chief Justice CAPPY.

The question before this court is whether the Superior Court erred in reversing the trial court's order denying preliminary injunctive relief. For the reasons that follow, we conclude that the Superior Court did indeed err and therefore reverse.

This matter involves an intra-family dispute over the control of Hanover Foods Company ("HFC").[2] The factual and procedural history is remarkably complex. In brief, Alan Warehime ("Alan") was the chairman and chief executive officer ("CEO") of HFC from 1956 to 1989. Alan was the father of three children: John Warehime ("John"), Michael Warehime ("Michael"), and Sally Warehime ("Sally").[3] In 1988, Alan created two voting trusts, one with his children and the other with his five grandchildren. Alan was designated as the sole voting trustee for both trusts. By their terms, both trusts were due to expire in 1998, ten years after their creation.

In 1989, John was appointed chairman and CEO of HFC. John gained further control over HFC when, upon Alan's death in 1990, he became the voting trustee of both trusts and

---

**2.** Michael asks us to take cognizance of events which have supposedly occurred since this litigation commenced; he at one point even requests that we take judicial notice of facts that are not of record. *See* Appellee's brief at 16. We decline this invitation. Rather, we believe it appropriate to decide this matter on the basis of the record before this court.

**3.** Sally's name is presently Sally Warehime Yelland.

acquired control over the majority of the voting shares of the corporation.[4]

Following John becoming the voting trustee of the voting trusts, several other family members expressed unhappiness over the way John was running HFC; boardroom disagreements escalated. In 1994, John eliminated cumulative voting rights, thus effectively preventing anyone other than himself from electing any members of the board. Promptly after the elimination of cumulative voting rights, John removed Michael, Sally, and an independent director from the Board; he replaced them with three hand-picked directors of his own choosing.

The removal of Michael and Sally did not, however, end the internecine disputes. Various actions were filed against John and HFC by Michael, Sally, and other shareholders. Michael and Sally also made it known that they were interested in removing John as the chairman of the board of HFC as soon as John lost control of the majority of HFC's voting stock upon the expiration of the voting trusts in 1998.

Viewing this potential change in corporate management as a negative, several members of John's hand-picked Board formed a body which they termed the "Independent Directors Committee" and drafted a plan ("the Plan"). The Plan proposed issuing 10,000 shares of Class C stock to HFC's 401k plan. These Class C shares would normally be nonvoting. Yet, in the event that there was disagreement among members of the Warehime family regarding election of members of the Board or other related matters, a complex change in the voting power of each class of shares would take place. If such a dispute were to occur within five years of the creation of the Class C stock, the Class C shares would be entitled to 35 votes a piece. Critically, these Class C shares were to be voted by three of HFC's directors, individuals whom John had appoint-

---

4. Upon gaining control of the shares in the trust, John could vote not only the shares of the two trusts but also the 8,558 voting shares he owned outright. The parties stipulated that this combination of shares from the trusts and shares John owned outright gave John a majority of the voting shares in the corporation. *See* Stipulation, dated 4/25/1997 and docketed 7/29/1997, at 3 ("Stipulation").

ed to the Board. The Class A stock, which is normally nonvoting, would in the event of a dispute be entitled to 1/10th of a vote a piece. The Class B stock would retain its same voting power of one vote per share.

The net effect of this Plan was that in the event of a dispute among Warehime family members, a majority of the Class B shareholders would not be able to determine the outcome of a vote for a period of five years after the Plan was created. Rather, John, John's children, and John's hand picked directors would be in control of 50.06% of the vote. Accordingly, the Plan created just enough votes to ensure that John, John's children, and the directors hand-picked by John would retain control over the corporation for years after the voting trusts expired. On February 13, 1997, notice was sent to HFC shareholders, informing them that there would be a vote on the Plan on February 24, 1997.

On February 21, 1997, Michael filed an action in equity against John, requesting preliminary injunctive relief; it is this action which is the subject of the instant appeal. Michael requested that the trial court enjoin the convening of the February 24, 1997 shareholder meeting or, in the alternative, enjoin John from voting the voting trust shares in favor of the Plan.

The trial court held a hearing. Following the hearing, the trial court denied Michael's request for preliminary injunctive relief. As the cornerstone for its opinion, the trial court stated that the impending expiration of the voting trusts introduced what the court deemed to be "instability" into HFC. Tr. ct. slip op., dated 6/24/1997, at 4. In the trial court's view, this "instability" was due to the fact that upon the expiration of the voting trusts, John would no longer have control over the corporation and that other shareholders could band together and vote to remove John and all of John's hand-picked members of the Board and replace them with a yet undetermined management. *Id.* The trial court found that this anticipated instability interfered with HFC's ability to raise equity capital and threatened HFC's corporate good health. *Id.* at 8–9.

The trial court opined that the Plan prevented such instability and thus was a positive good. Furthermore, it determined that the Plan did not present a conflict of interest between John's private interests and his duties as voting trustee. *Id.* at 34. Rather, the Plan reflected a good faith effort to serve the best interests of HFC since it assured stability in the governance structure of HFC for a five-year period. *See id.* at 41–42. Accordingly, on June 24, 1997, the request for a preliminary injunction was denied. The following day, John convened a meeting and voted all of his shares as well as all of the trust shares in favor of the Plan, and the Plan was therefore adopted.

Michael appealed to the Superior Court which reversed. *Warehime v. Warehime,* 722 A.2d 1060 (Pa.Super.Ct.1998). The court concluded that John had breached his duty of loyalty to the trust beneficiaries. We, in turn, reversed on appeal. *Warehime v. Warehime,* 563 Pa. 400, 761 A.2d 1138 (2000) (*"Warehime I"*). In *Warehime I,* we stated that since John had acted in good faith and did not act for his own personal benefit, then he did not violate his fiduciary duties as voting trustee. Accordingly, we reversed the Superior Court and remanded for that court to consider the other issues that had been raised by Michael but not addressed by the lower court.

The Superior Court on remand denied relief to Michael on all but one of his claims. *Warehime v. Warehime,* 777 A.2d 469 (Pa.Super.Ct.2001) (*"Warehime II"*). On Michael's corporate democracy claim, however, the court granted Michael relief. The court reasoned that the Plan was designed to make it

impossible for the owners of a majority of HFC's Class B voting shares to replace John ... and the other directors at the conclusion of the voting trusts in 1998 .... Thus, the opposition shareholders were completely divested of any power to affect the outcome of any vote in which there was disagreement .... Therefore, the [P]lan systematically deprived the Class B voting majority of the impact of their right to vote.

*Id.* at 477. The Superior Court found such a situation to be unacceptable, noting that it interfered with a shareholder's right to vote, a right which "is among the most fundamental rights of ownership of voting shares." *Id.* (citing *Reifsnyder v. Pittsburgh Outdoor Adver. Co.*, 405 Pa. 142, 173 A.2d 319, 322 (1961)).

John filed a Petition of Allowance Appeal. We granted allocatur. For the following reasons, we conclude that the Superior Court erred in its choice of standard of review for this matter. Furthermore, upon application of the appropriate standard of review, we find that the Superior Court improperly reversed the trial court's order. Accordingly, we reverse.

██ The first step of our analysis is to determine our appropriate standard of review. In conducting its review of this matter, the Superior Court commenced its analysis by stating that since the trial court held exhaustive hearings then its "appropriate standard of review is for an appeal from a final decree rather than from a preliminary injunction." *Warehime II*, 777 A.2d at 477. Accordingly, it stated that it would review this matter for an abuse of discretion or error of law. *Id.* As an aside, the court recognized that "different standards of review are employed during an appeal from a preliminary injunction as opposed to a permanent injunction[.]" Yet, it flatly concluded that "the outcome of this case is the same under either standard." *Id.* The Superior Court did not, however, set forth the standard of review for preliminary injunction matters nor apply that standard to this case.

██ We must now determine whether the Superior Court was correct in viewing this matter as an appeal from final injunctive relief. As noted *supra*, the Superior Court reasoned that since the trial court held extensive hearings in this matter, then its denial was in the nature of a denial of permanent injunctive relief. *Id.* We reject this reasoning. The mere holding of hearings with regard to a motion for a preliminary injunction does not somehow morph that motion into a request for a permanent injunction. In fact, our rules

specifically contemplate that hearings may be held on requests for preliminary injunctions. *See* Pa.R.Civ.P. 1531. Accordingly, the matter is properly viewed as an appeal from the denial of preliminary injunctive relief.

Our next step is to set forth and apply the standard of review applicable to preliminary injunction matters.[5] We have emphasized that our review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential". *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount Inc.*, 573 Pa. 637, 828 A.2d 995, 1000 (2003).[6] This "highly deferential" standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to "examine the record to determine if there were any apparently reasonable grounds for the action of the court below." *Id.*[7] We will find that a trial court had "apparently reasonable grounds" for its denial of injunctive relief where the trial court has properly found "that any one of the following 'essential prerequisites' for a preliminary injunction is not satisfied." *Id.* at 1002.

There are six "essential prerequisites" that a party must establish prior to obtaining preliminary injunctive relief. The party must show: 1) "that the injunction is necessary to

5. Since the Superior Court neither set forth nor applied the preliminary injunction standard, we could simply reverse at this juncture and remand for the Superior Court to apply the proper standard. In the interests of judicial economy, we choose not to follow this course. Litigation in this preliminary injunction matter commenced more than seven years ago. A remand would further protract this process. Furthermore, as the question of the application of the proper standard of review is purely a question of law, it is one which we are quite capable of resolving in the first instance.

6. We recognize that *Summit Towne Centre* was handed down after the Superior Court issued its decision below. With regard to the standard employed in the review of preliminary injunction matters, however, *Summit Towne Centre* was merely reaffirming established case law. It did not announce a new rule of law, one of which the Superior Court would have been unaware when it issued its decision.

7. *Summit Towne Centre* does not specify a scope of review to be employed in preliminary injunction matters. The thrust of the opinion, however, is that an appellate court is to conduct a searching inquiry of the record. Accordingly, we find that the scope of review in preliminary injunction matters is plenary.

prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect the public interest." *Id* at 1002. The burden is on the party who requested preliminary injunctive relief—in this matter, Michael.

■ In applying the *Summit Towne Centre* standard to this matter, it becomes clear that the Superior Court erred in reversing the order of the trial court. The trial court below supported its denial of preliminary injunctive relief by finding, *inter alia,* that Michael did not satisfy prongs one and two of the preliminary injunction standard. As to prong one, the trial court stated that Michael had not adduced *any* evidence of irreparable harm. Tr. ct. slip op at 36. Significantly, Michael does not counter this finding before our court.

As to prong two, the trial court found that "far greater harm would result from the granting of the preliminary injunction which would likely result in the deterioration and sale of the company." *Id.* This is supported by the trial court's numerous factual findings that the dispute among Warehime family members was causing significant disruption to HFC's business and that the anticipated change in management (once John lost control of the voting trusts) would have seismically negative repercussions on the company. *See, e.g., id.* at 8–9. Again, Michael does not show how the trial court erred in finding that the issuance of a preliminary injunction in Michael's favor would cause far greater harm than would the refusal to issue it.

With such findings, we cannot conclude that the trial court lacked any apparently reasonable grounds for its order denying relief. Pursuant to the *Summit Towne Centre* standard, the order of the trial court must be upheld. Therefore, we conclude that the Superior Court erred in reversing the trial court's order denying preliminary injunctive relief.

In closing, we must address Michael's extensive prayer for relief. At the close of his brief, Michael requests that we provide "plain and meaningful" relief and bring to an end not only the litigation in the matter *sub judice*, but in all matters relating to the recent troubles at HFC. He claims that the type of relief he desires was granted by the Court of Common Pleas of York County in a matter captioned *Warehime v. Schaier*, No. 99–SU–03860–07 on October 10, 2000. Michael notes that the trial court's order in *Warehime. v. Schaier* was stayed by this court on October 11, 2000 and that the stay remains in effect.[8] He now requests that we "approve" of the relief that the *Warehime v. Schaier* trial court granted.

We reject Michael's request that we endorse the relief granted by the trial court in *Warehime v. Schaier*. It would be most irregular for us to opine on the propriety of the trial court granting relief in the *Warehime v. Schaier* matter as that matter is not on appeal before this court.

With that said, however, it is no longer necessary for us to continue to stay the order in *Warehime v. Schaier*. We entered a stay in an abundance of caution in order to preserve the status quo pending completion of appellate review in the matter *sub judice*. As appellate review of the preliminary injunction matter is now unquestionably exhausted,[9] the purpose animating our stay order is now defunct. Accordingly we dissolve the stay we entered in the *Warehime v. Schaier*

8. This stay order was entered at docket number 251 MAP 1999. In pertinent part, it states that "upon consideration of John Warehime's Emergency Application for a Stay, it is hereby ORDERED that the Emergency Application is GRANTED and the October 10, 2000 Order of the York County Court of Common Pleas entered in trial court No. 99–SU–03860–07 is STAYED pending further order of this Court."

9. We note that there are no preserved issues of federal law in this matter. Accordingly, we are the court of last resort in this matter.

matter; with the stay dissolved, any further proceedings with regard to that matter may now transpire.

Accordingly, we reverse the order of the Superior Court and dissolve the stay we entered at 251 MAP 1999.

Justice EAKIN did not participate in the consideration or decision of this matter.

Former Justice LAMB did not participate in the decision of this case.

Justices CASTILLE and NIGRO dissent.