J-A20024-18

2019 PA Super 31

| JAMES E. PORTER, JR. AND MARY PORTER, HUSBAND AND WIFE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellants | : | |
| v. | : | |
| | : | No. 16 WDA 2018 |
| CHEVRON APPALACHIA, LLC | : | |

Appeal from the Order November 28, 2017
In the Court of Common Pleas of Fayette County Civil Division at No(s):
1612 of 2017 G.D.

BEFORE: BENDER, P.J.E., LAZARUS, J., and MUSMANNO, J.

OPINION BY LAZARUS, J.:                                    FILED FEBRUARY 8, 2019

James E. Porter, Jr., and Mary Porter, h/w (collectively, the "Porters"), appeal from the order entered in the Court of Common Pleas of Fayette County, granting the motion of Chevron Appalachia, LLC ("Chevron"), for a preliminary injunction. Upon careful review, we affirm.

The Porters are the owners of a 76-acre parcel of land in Lucerne Township, Fayette County, which is subject to an oil and gas lease entered into between the Porters and Atlas America, Inc., Chevron's predecessor-in-interest, on October 20, 2002 ("Lease"). Paragraph 1 of the Lease grants Chevron exclusive rights as lessee:

> for the purpose of drilling, operation for, producing, and removing of oil and gas and all the constituents thereof, and of injecting air, gas, brine, and other substances from any source and into any subsurface strata and to transport by pipelines or otherwise across and through said lands oil, gas, and their constituents from the subject and other lands, regardless of the source of such gas or the location of <u>the wells</u>, which right to transport gas from other

properties across the leasehold premises shall survive the term of this lease for so long as the transportation of such gas may be desired by the Lessee, and of placing of tanks, equipment, roads, and structures thereon to procure and operate for the said products, together with the right to enter into and upon the lease premises at all times for the aforesaid purposes. . . .

Oil and Gas Lease, 10/20/02, at ¶ 1 (emphasis added).

Paragraph 10 of the Lease provides that:

The Lessor hereby grants in the Lessee the right at any time to consolidate the leased premises or any part thereof or strata therein with other lands to form an oil and gas development unit or units of not more than 640 acres, or such larger unit as m[a]y be required by state law or regulation for the purpose of drilling a well thereon, but the Lessee shall in no event be required to drill more than one well on any such unit or units.

. . .

The Lessee shall effect such consolidations by executing a declaration of consolidation with the same formality as this oil and gas lease setting forth the leases or portions thereof consolidated, the royalty distribution and recording the same in the recorder's office at the courthouse in the county in which the leased premises are located and by mailing a copy thereof to the Lessor at the address herein above provided for such use shall be payable to the owners of the parcels of land comprising said unit or units in the proportion that the acreage of each parcel bears to the entire acreage consolidated. Lessee shall have the right to amend, alter, or correct any such consolidation at any time in the same manner as herein provided.

Id. at ¶ 10.

Prior to Chevron succeeding to Atlas's interests in the lease, Atlas had drilled multiple conventional, vertical wells on the Porters' property that were used to produce oil and gas from the Porters' land. In or about 2017, Chevron gave notice to the Porters that it intended to develop and construct a well pad

on the Porters' property to accommodate multiple, unconventional wells to produce oil and gas from neighboring properties.

On July 26, 2017, the Porters filed a complaint against Chevron, asking the court to declare that Chevron may not use the surface of their land to construct either a well pad site for use in the production of oil and gas from adjoining lands, or an access road to and from the well pad site. The Porters also requested preliminarily and permanent injunctions. On August 16, 2017, Chevron filed preliminary objections in the form of a demurrer. The Porters filed an answer to Chevron's preliminary objections on August 21, 2107.

While the preliminary objections were pending, Chevron notified the Porters, through counsel, that it would be visiting the site to conduct an environmental assessment and geotechnical investigation of the property in preparation for the filing of an application for a permit with the Pennsylvania Department of Environmental Protection ("DEP"). Chevron also notified the Porters that it would be "staking" the property in order to comply with Pennsylvania's One Call System, which requires excavators to mark digging sites in order to prevent interference with utility lines.

On October 10, 2017, Chevron personnel, including Rodney Frazee, the Surface Land Term Lead for Chevron, arrived at the property to begin staking and found a lock on the gate to Porter's property, which prevented vehicle access. After staking the property, Frazee was approached by Mr. Porter, who asked them to remove the stakes. Frazee indicated that he could not remove the stakes, after which Mr. Porter threatened to remove them himself. When

Frazee later returned to verify whether Mr. Porter had, in fact, removed the stakes, he again encountered Mr. Porter, who told him "you best get off my property while the getting's good."   N.T. Preliminary Injunction Hearing, 11/22/17, at 36.   Interpreting Mr. Porter's statement as a threat, Chevron personnel left the property.

On October 18, 2017, Chevron filed a motion for preliminary injunction, seeking to enjoin the Porters from "preventing access to and development of Chevron's oil and gas rights."  Motion For Preliminary Injunction, 10/18/17, at ¶ 15.  The Porters filed an answer and new matter, in which it asserted that Chevron was not entitled to injunctive relief because it had not asserted any cause of action against the Porters.   Thereafter, Chevron withdrew its preliminary objections to the Porters' complaint and, on November 16, 2017, filed an answer thereto, as well as a counterclaim seeking declaratory and injunctive relief.   On November 22, 2017, the court held a hearing on Chevron's preliminary injunction motion and, by order dated November 29, 2017, granted the requested relief.  This timely appeal follows, in which the Porters raise the following claims for our review:

> 1.  Whether the trial court abused its discretion by ordering the Porters to permit Chevron to conduct geotechnical testing on the surface of the Porter Farm where Chevron failed to provide any clear evidence that it would suffer immediate and irreparable harm if such testing was delayed?
>
> 2.  Where Chevron had never previously entered onto the surface of the Porter Farm to conduct any activities relative to the production of oil and gas from beneath adjoining lands, whether the trial court erred or abused its discretion by effectively

changing that status quo by ordering the Porters to permit Chevron such access?

3. Whether the trial court committed an error of law or abused its discretion by effectively determining on the merits that Chevron has an absolute right to operate on the surface of the Porter Farm to produce oil and gas from beneath adjoining lands in order to support its grant of a mandatory preliminary injunction?

Brief of Appellants, at 3.

Our review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential".[1] Warehime v. Warehime, 860 A.2d 41, 46 (Pa. 2004). Thus, in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to "examine the record to determine if there were any apparently reasonable grounds for the action of the court below." Id. The scope of our review is plenary. Id. at n.7.

A petitioner seeking a preliminary injunction must establish six prerequisites; failure to establish any one of them results in the denial of relief.

To obtain a preliminary injunction, a petitioner must establish that: (1) relief is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages; (2) greater injury will occur from refusing to grant the

_____

[1] In their appellate brief, the Porters assert that the relief granted by the trial court constitutes a mandatory injunction, which would require greater scrutiny on appellate review. See Kessler v. Broder, 851 A.2d 944, 947 (Pa. Super. 2004), quoting Mazzie v. Commonwealth, 432 A.2d 985, 988 (Pa. 1981) ("[I]n reviewing the grant of a mandatory injunction, we have insisted that a clear right to relief in the plaintiff be established."). However, in this case, the injunctive relief is merely prohibitory, requiring that the Porters refrain "from taking any actions inconsistent or in interference with Chevron's rights to perform activities related to permitting and site testing on the Porter property[.]" Order, 11/28/17.

injunction than from granting it; (3) the injunction will restore the parties to their status quo as it existed before the alleged wrongful conduct; (4) the petitioner is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) the public interest will not be harmed if the injunction is granted.

Brayman Const. Corp. v. Com., Dep't of Transp., 13 A.3d 925, 935 (Pa. 2011), citing Summit Towne Centre, Inc. v. Shoe Show of Rocky Mt., Inc., 828 A.2d 995, 1001 (Pa. 2003).

The Porters first allege that the court erred in finding that Chevron established the existence of immediate and irreparable harm, not compensable by money damages. They argue that Chevron made no showing that a delay in performing the geotechnical testing "might result in the expiration or termination of oil and gas leases, cause the loss of business or marketing opportunities, waste resources already invested, jeopardize existing contracts with third parties, or forfeit any favorable feature of current market or regulatory conditions[.]" Brief of Appellants, at 12. Rather, the Porters argue, the only delay-related harm shown in the record is the inconvenience to Chevron of having to wait to conduct the tests at a later time.

The trial court was satisfied that Chevron established irreparable harm not compensable by money damages. First, the court noted our Supreme Court's pronouncement that, "[i]n light of the unique and intrinsic value of land, interference with . . . contractual rights to ownership of that land must be deemed irreparable harm." Trial Court Opinion, at 7, quoting New Eastwick Corp. v. Philadelphia Builders Eastwick Corp., 241 A.2d 766,

770 (Pa. 1968). In addition, the court found that inability to access the Porters' land would cause continued delay in Chevron's operations, which would not only push back production on the well pad to be erected on the Porters' property, but also effect other unrelated production plans due to resulting equipment delays. The court found this possibility of delay particularly significant because Chevron could only complete the necessary geotechnical testing at certain times of the year when the ground was not frozen.

In light of the foregoing, we find the record contains reasonable grounds for the court to conclude that Chevron would suffer irreparable harm in the absence of an injunction. Warehime, supra. The Porters' actions deprived Chevron of contractual rights in land pursuant to the 2002 lease, which in and of itself supports a finding of irreparable harm. See New Eastwick Corp., supra. Moreover, the testimony presented by Chevron supports a finding that interference with Chevron's access to perform the necessary testing would result in delay-related costs that would be impossible to quantify.

The Porters next assert that the trial court erred in finding that an injunction will restore the parties to the status quo as it existed immediately prior to the alleged wrongful conduct. Rather, the Porters argue that, because Chevron had never previously entered or attempted to enter the land or conducted any activities thereon, the injunction allowing Chevron access to the land actually created a new status quo.

The trial court found that the status quo existing immediately prior to the wrongful conduct was that "Chevron's predecessor, Atlas, had access to the Porters' land under the Lease as well as in practice. Chevron, as successor-in-interest to Atlas under the Lease, is entitled to the same status." Trial Court Opinion, at 9.

We agree with the trial court that whether Chevron itself had actually exercised its rights under the Lease prior to the Porters' wrongfully denying it access to the land is irrelevant. "The status quo to be maintained by a preliminary injunction is the last actual, peaceable and lawful noncontested status which preceded the pending controversy." Allegheny Anesthesiology Associates, Inc. v. Allegheny Gen. Hosp., 826 A.2d 886, 894 (Pa. Super. 2003). Here, that "noncontested status" was Chevron's contractual right of access to the land for the purposes set forth in the Lease agreement, which its predecessor-in-interest had exercised without interference. In denying Chevron access, the Porters interfered with the status quo. Accordingly, there were reasonable grounds for the court to conclude that an injunction was necessary to restore the status quo.

Finally, the Porters claim that the trial court erred by effectively reaching the ultimate issue in this case and determining that Chevron "has the absolute right to use the Porter Farm for whatever oil and production activities it wants." Brief of Appellants, at 15. The Porters claim that the trial court's interpretation of the Lease is incorrect and, properly interpreted, the Lease limits Chevron to the drilling of one well. The Porters cite the following

language from Paragraph 10 to support their "one well" interpretation, which grants:

> Lessee the right at any time to consolidate the leased premises or any part thereof . . . with other lands to form an oil and gas development unit or units . . . for the purpose of drilling <u>a well</u> thereon, but the Lessee shall in no event be required to drill more than one well on any such unit or units.

Oil and Gas Lease, 10/20/02, at ¶ 10 (emphasis added). The Porters further argue that, although the unitization clause in Paragraph 10 authorizes Chevron to "consolidate" the Porter Farm with other land to create oil and gas development units, Chevron has not done so in accordance with the terms of the Lease. In any case, the Porters argue, Paragraph 10 limits Chevron to the drilling of "a well" on any such unit.

> We begin by noting that
>
> oil and gas leases are subject to the same contract law principles that apply to contract interpretation generally. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. We must be mindful that the object in interpreting instruments relating to oil and gas interests, like any written instrument, is to ascertain and effectuate the intention of the parties.

Loughman v. Equitable Gas Co., LLC, 134 A.3d 470, 474 (Pa. Super. 2016) (internal citations and brackets omitted). In construing a contract, we must give effect to all of the provisions therein. Capek v. Devito, 767 A.2d 1047, 1050 (Pa. 2001). "An interpretation will not be given to one part of the contract which will annul another part of it." Id., quoting Cerceo v. DeMarco, 137 A.2d 296, 298 (Pa. 1958) (citations omitted).

Here, the trial court interpreted Paragraph 10 to permit the drilling of multiple wells. The court reasoned as follows:

[The Porters] read "a well" to mean "only one well, and no more." However, the indefinite article "a" does not always lend itself to this definition, and it must be interpreted within the larger context of the sentence[.] As an example, Article I, Section 5 of the United States Constitution states that "[e]ach House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a member." [U.S. Const. art. 1, § 5] (emphasis added). Certainly, the [Framers did not] intend for each House of Congress to only have the ability to expel one member ever. Likewise, the sentence in Paragraph 10 of the Lease must be construed as a whole. After the sentence that states that Chevron can drill "a well thereon," it continues by stating that ". . . Lessee shall in no event be required to drill more than one well on any such unit or units." This clearly contemplates that Chevron may drill multiple wells on consolidated units. The language here does not limit Chevron to drilling only one well; it just provides that Chevron is not required to drill more than one well.

Trial Court Opinion, at 10-11. The trial court further found that the consolidation argument raised by the Porters was unavailing, because there would be nothing to prevent Chevron from unitizing if required by the court. We can discern no error in the trial court's reasoning.

Initially, the Porters' assertion that the court determined that Chevron had "the absolute right to use the Porter Farm for whatever oil and production activities it wants" is factually incorrect. The trial court, at this preliminary injunction stage, did not conclude that Chevron possessed an "absolute right" to use the property for any and all oil and production activities. Rather, the court's grant of relief was limited to allowing Chevron access to the Porters'

land "for the limited purpose of conducting necessary testing required to obtain a DEP permit." Trial Court Opinion, 2/27/18, at 13.

In addition, the court did not exceed the proper scope of inquiry regarding the ultimate merits of the case. In a preliminary injunction action, the moving party, in order to prove that it is likely to prevail on the merits, must establish a prima facie right to relief. Synthes USA Sales, LLC v. Harrison, 83 A.3d 242, 249 (Pa. Super. 2013) Thus, where the terms of a lease form the basis for a party's request for injunctive relief, a court must, necessarily, address the underlying merits by analyzing the terms of the lease and interpreting its provisions in order to determine whether the party is likely to prevail on the merits.[2] See Santoro v. Morse, 781 A.2d 1220, 1229 (Pa. Super. 2001) (because moving party must show he has reasonable likelihood of success on merits, it is entirely reasonable and proper for court to consider testimony going to merits at time of preliminary injunction hearing). Accordingly, it was entirely proper for the court to interpret the terms of the Lease in making a preliminary determination as to Chevron's likelihood of success on the merits. We further find the trial court's above-quoted interpretation of Paragraph 10 to be reasonable, particularly in light of the contract-law precepts that, in construing a contract, we must give effect to all

_____

[2] Of course, a preliminary injunction proceeding does not fully and finally adjudicate the parties' rights, and the principles of res judicata and collateral estoppel are inapplicable to any findings made by the court during those proceedings. Santoro, 781 A.2d at 1229.

its provisions and that an interpretation will not be given to one part of the contract which will annul another part of it.  Capek, supra.

Because there existed reasonable grounds for the grant of a preliminary injunction in favor of Chevron, Warehime, supra, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/8/2019