J-A05010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TRAFFIC CONTROL SERVICES, LLC D/B/A FLAGGER FORCE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1052 MDA 2021 |
| KEVIN ERSKINE AND JENNIFER HARMON | : | |
| | : | |

Appeal from the Order Entered April 26, 2021
In the Court of Common Pleas of York County Civil Division at No(s):
2020-SU-001061

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                          **FILED APRIL 19, 2022**

Appellant, Traffic Control Services, LLC d/b/a/ Flagger Force, appeals

from the April 26, 2021 order denying its petition for injunctive relief against

Kevin Erskine ("Erskine") and Jennifer Harmon ("Harmon").[1]  We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] On April 26, 2021, the trial court entered an order denying Appellant's petition for injunctive relief.  Appellant subsequently filed a motion for reconsideration of that order, which the trial court denied on May 5, 2021.  On May 26, 2021, Appellant filed a motion for certification of the trial court's April 26, 2021 order as an interlocutory order appealable by permission pursuant to 42 Pa.C.S.A. § 702(b).  **See** 42 Pa.C.S.A. § 702(b) (stating, "When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, it shall so state in such order.  The appellate court may thereupon, in its discretion, permit an appeal to be taken from such

The trial court summarized the factual and procedural history as follows:

> [Erskine] began his employment with [Appellant] on March [21, 2016]. His employment ended by his voluntary resignation on April 16, 2019. After leaving [his employment with Appellant], Erskine began employment with a competitor, Traffic Management[, Inc. ("TMI")].
>
> [Appellant] alleges that Erskine executed a non-compete agreement at the time of his hire which precluded him from, *inter*

---

interlocutory order."). On May 28, 2021, the trial court denied Appellant's request for certification of the April 26, 2021 order as an interlocutory order subject to appeal by permission.

On June 28, 2021, Appellant filed a petition pursuant to Pennsylvania Rule of Appellate Procedure 1311(a) with this Court requesting permission to appeal the April 26, 2021 order. Rule 1311(a) states, *inter alia*, that "[a]n appeal may be taken by permission from an interlocutory order . . . for which certification pursuant to 42 Pa.C.S.A. § 702(b) was denied[.]" **See** Pa.R.A.P. 1311(a)(1). Appellant's petition for permission to appeal an interlocutory order was docketed by this Court at 59 MDM 2021. On July 12, 2021, Erskine and Harmon filed, with this Court, an answer to Appellant's petition. In an August 9, 2021 *per curiam* order, this Court treated Appellant's petition for permission to appeal as a notice of appeal pursuant to Pennsylvania Rule of Appellate Procedure 1316(a)(1) because the April 26, 2021 order was immediately appealable and, thereupon, denied Appellant's petition for permission to appeal as moot. **See** *Per Curiam* Order (59 MDM 2021), 8/9/21; **see also** Pa.R.A.P. 1316(a)(1) (stating, "[t]he appellate court shall treat a request for discretionary review of an order that is immediately appealable as a notice of appeal if a party has filed a timely petition for permission to appeal pursuant to Pa.R.A.P. 1311"); Pa.R.A.P. 311(a)(4) (stating that, "[a]n order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction" is appealable as of right without reference to Pa.R.A.P. 341(c) unless the order was entered under circumstances that do not apply in the case *sub judice*). Thereupon, this Court docketed the appeal at 1052 MDA 2021.

Under the procedural posture of the case *sub judice*, Appellant's appeal properly lies from the April 26, 2021 order denying his petition for preliminary injunctions. The caption has been corrected accordingly.

- 2 -

*alia*, working for a competitor to [Appellant] for a period of [two] years following the separation of his employment.

[Harmon] started her employment with [Appellant] in May [] 2006. She started in an entry level position and worked her way up through the company, having reached a senior management position by 2018. She [] left her employment with [Appellant] by voluntary resignation[] on February 12, 2020. After leaving [her employment with Appellant], Harmon [] joined TMI as a field operations manager. In that role, she is responsible to cover three geographical regions: the Rocky Mountain region, the Great Lake[s] region, and the Mid-Atlantic region.

[Appellant] alleges Harmon executed two non-compete agreements during her time of employment, which [it] allege[s] bar her from her employment with TMI and which bar her from soliciting customers and employees of [Appellant]. The alleged non-compete [agreements] are essentially the same, with the first being executed in 2012[,] and the second being executed in 2016. [Appellant] alleges [that] both agreements were [] essential term[s] of Harmon's promotion[s] and that both were accompanied by higher[-]than[-]average pay increases.

[Appellant] filed a civil complaint against both Erskine and Harmon on May 7, 2020. [Appellant] then filed a petition [seeking] preliminary injunction[s against Erskine and Harmon] on May 11, 2020. Erskine and Harmon filed preliminary objections [on] June 25, 2020[.] On August 21, 2020[,] the preliminary objections were assigned to [the trial] court for disposition. After oral argument, [the trial court,] on September 17, 2020[, overruled] the preliminary objections[.] The pleadings were then completed and closed.

Though [Appellant] filed its petition [for injunctive relief on] May [11,] 2020, no action was taken [by Appellant] to have the matter set for [a] hearing. On February 26, 2021, the [trial] court *sua sponte* entered an order scheduling a hearing on [Appellant's] request for injunctive relief[.]

- 3 -

Trial Court Opinion, 4/26/21, at 1-3 (extraneous capitalization omitted).[2] The trial court entertained argument on the petition for injunctive relief, and the parties presented evidence and testimony in favor of, and in opposition to, Appellant's request for injunctive relief on March 17, 2021, March 22, 2021, and April 15, 2021. At the conclusion of the hearing, the parties submitted written summaries of their respective arguments to the trial court. On April 26, 2021, the trial court denied Appellant's petition for preliminary injunctions against Erskine and Harmon. This appeal followed.[3]

Appellant raises the following issues for our review:

[1.] Did the trial court err in determining that [the non-compete] agreement between [Appellant] and Erskine was unenforceable because it was entered [into] on Erskine's first day of employment?

[2.] Did the trial court err in concluding that the [non-compete] agreement between [Appellant] and Harmon was not supported by adequate consideration?

[3.] Did the trial court err in concluding that [Appellant] failed to demonstrate immediate and irreparable harm?

[4.] Did the trial court err in concluding that the [non-compete] agreements between [Appellant] and [Erskine and Harmon] were unenforceable due to geographical overbreadth when

_____

[2] For ease of reference, we assigned page numbers to the trial court's unpaginated April 26, 2021 opinion.

[3] Both Appellant and the trial court complied with Pa.R.A.P. 1925. In its Rule 1925(a) opinion, the trial court stated it was relying on its April 26, 2021 opinion that accompanied the order denying Appellant's petition for injunctive relief. *See* Trial Court Opinion, 9/8/21.

[Erskine and Harmon] presented no evidence to establish that the restrictions were unreasonable?

[5.] Did the trial court err in determining that [Appellant's] claims against Erskine were moot?

Appellant's Brief at 6 (extraneous capitalization omitted).[4]

Appellant's claims, *in toto*, challenge the trial court's order denying Appellant's request for preliminary injunctions against Erskine and Harmon. *Id*. at 21-35.

Our review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential". Thus, in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to "examine the record to determine if there were any apparently reasonable grounds for the action of the court below." The scope of our review is plenary.

*Porter v. Chevron Appalachia, LLC*, 204 A.3d 411, 416 (Pa. Super. 2019) (individual citations and footnote omitted), *citing* *Warehime v. Warehime*, 860 A.2d 41 (Pa. 2004). "[W]e do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the trial court."[5] *Summit Towne Centre, Inc. v. Shoe Show of Rocky*

---

[4] For ease of disposition, Appellant's issues have been renumbered.

[5] We recognize that there is a distinction between a prohibitory injunction and a mandatory injunction. As this Court in *Ambrogi v. Reber*, 932 A.2d 969 (Pa. Super. 2007) explained,

***Mount, Inc.***, 828 A.2d 995, 1000 (Pa. 2003) (citation and original brackets

omitted).

> A petitioner seeking a preliminary injunction must establish six
> prerequisites; failure to establish any one of them results in the
> denial of relief.
>
>> To obtain a preliminary injunction, a petitioner must
>> establish that: (1) relief is necessary to prevent immediate
>> and irreparable harm that cannot be adequately
>> compensated by money damages; (2) greater injury will
>> occur from refusing to grant the injunction than from
>> granting it; (3) the injunction will restore the parties to their
>> *status quo* as it existed before the alleged wrongful conduct;
>> (4) the petitioner is likely to prevail on the merits; (5) the
>> injunction is reasonably suited to abate the offending
>> activity; and (6) the public interest will not be harmed if the
>> injunction is granted.

***Porter***, 204 A.3d at 416, *citing* ***Brayman Constr. Corp. v. Commonwealth,***

***Dep't of Transp.***, 13 A.3d 925 (Pa. 2011).

Within the context of an employee non-compete agreement, such as the

ones executed by Erskine and Harmon in the case *sub judice*, the non-compete

---

> While the purpose of all injunctions is to preserve the *status quo*,
> prohibitory injunctions do this by forbidding an act or acts while
> mandatory injunctions command the performance of some
> specific act that will maintain the relationship between the parties.
> As a general matter, appellate inquiry is limited to a determination
> of whether an examination of the record reveals that "any
> apparently reasonable grounds" support the trial court's
> disposition of a request for a preliminary injunction. However,
> greater appellate scrutiny is required when a court issues a
> mandatory injunction[, which must be supported by a clear right
> to relief.]

***Ambrogi***, 932 A.2d at 974-975 (citations omitted), *appeal denied*, 952 A.2d
673 (Pa. 2008).

agreement, to be enforceable, must be supported, at the time of execution, by consideration "either in the form of an initial employment contract or a change in the conditions of employment[.]" **Pulse Technologies, Inc. v Notaro**, 67 A.3d 778, 781 (Pa. 2013). In **Pulse Technologies**, our Supreme Court further explained, "[a]s long as the restrictive covenants are an auxiliary part of the taking of regular employment, and not an after-thought to impose additional restrictions on the unsuspecting employee, a contract of employment containing such covenants is supported by valid consideration, and is therefore enforceable." **Id.** (citation omitted). Stated another way, a restrictive covenant, such as a non-compete agreement, is supported by consideration, and, thus, enforceable, when the restrictive covenant is contained within the employment agreement and is simultaneously executed with the taking of employment. **Id.** The **Pulse Technologies** Court held that a non-compete agreement that is executed after the employment relationship has been established, however, must be supported by new consideration. **Id.** at 782. The continuation of an employment relationship cannot serve as sufficient consideration for the restrictive covenant to be enforceable even when the employment relationship is terminable at the will of either party. **Id.**

Our Supreme Court has instructed that, in general, non-compete agreements are disfavored. **Pittsburgh Logistics Syss., Inc. v. Beemac Trucking, LLC**, 249 A.3d 918, 932 (Pa. 2021) (noting that, Pennsylvania law provides a "long history of disfavoring restrictive covenants" (citation and

original quotation marks omitted)). Nonetheless, under current Pennsylvania law, non-compete agreements within the context of an employment relationship have been recognized as valid and enforceable when certain requirements are satisfied. *Id.*

> Consistent with this legal background, currently in Pennsylvania, restrictive covenants are enforceable only if they are: (1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer.

*Id.* (citation omitted).

In its first and second issues, Appellant asserts that the trial court erred and abused its discretion in determining that Erskine's and Harmon's non-compete agreements were unenforceable because they were not supported by consideration. Appellant's Brief at 24-29. We begin our analysis by reviewing Erskine's non-compete agreement and then consider the restrictive covenants in Harmon's non-compete agreements.

Appellant contends that, "Erskine executed [his non-compete agreement] on the day his employment with [Appellant] began" and that "his employment with [Appellant] was the consideration rendering the restrictive covenants enforceable[.]" *Id.* at 26-27. Appellant further contends that Erskine understood the execution of the non-compete agreement to be a requirement of his new employment which, it maintains, is confirmed by the language of the non-compete agreement. *Id*. at 26.

Here, the trial court denied Appellant's petition for injunctive relief, *inter alia*, because Erskine's non-compete agreement was not supported by consideration and, therefore, unenforceable. Trial Court Opinion, 4/26/21, at 4 and n.1. Specifically, the trial court found that "Erskine was first presented [with] the non-compete agreement on his first day of work, after having accepted the position with other stated contingencies, after having left his previous employment, and without the ability to review the agreement with an attorney." *Id.* at 4 n.1.

The record demonstrates that Erskine participated in Appellant's hiring process after he was approached by a recruiting firm. N.T., 3/22/21, at 59-60. Appellant's hiring process lasted four to five months and included several interviews with Appellant's management team. *Id.* At the conclusion of the hiring process, Erskine received an offer of employment from Appellant *via* a letter dated February 22, 2016. *Id*. at 61; *see also id.* at Exhibit 1. The letter stated, "This offer is contingent upon successful completion of our background check process, driver's license record check[,] and pre-employment drug screening. The pre-employment drug screening must occur within 3 days of acceptance of this offer letter." N.T., 3/22/21, at Exhibit 1. Appellant's vice president for human resources testified that Erskine received the offer letter on March 1, 2016, and he completed the pre-employment drug screening on March 2, 2016. N.T., 4/15/21, at 83-84. The vice president for human resources further stated that Appellant and Erskine had a verbal agreement for employment prior to March 21, 2016,

when Erskine reported to Appellant's headquarters for new-hire orientation and training. *Id.* at 88; *see also* N.T., 3/22/21, at 62. Erskine testified that the non-compete agreement was not mentioned during the hiring process or prior to his arrival at Appellant's headquarters on March 21, 2016. N.T., 3/22/21, at 114-115. Moreover, a review of the February 22, 2016 offer letter does not mention a non-compete agreement, and execution of the non-compete agreement is not listed as a contingency of the employment offer. *See* N.T., 3/22/21, at Exhibit 1.

Upon his arrival at Appellant's headquarters on March 21, 2016, Erskine was presented with a non-compete agreement after the execution of his new hire paperwork and at some time during his new-hire orientation and training. N.T., 3/22/21, at 65-67. Erskine felt "pressured" to sign the non-compete agreement, and he understood that he was already an employee of Appellant when he signed the agreement. *Id.* at 117.

Upon review, we discern no error of law or abuse of discretion in the trial court's order denying injunctive relief on Appellant's claims against Erskine. The record reveals apparently reasonable grounds to support the trial court's determination that Erskine's non-compete agreement, executed March 21, 2016, was not executed ancillary to the formation of his employment relationship with Appellant and was not supported by new consideration at the time of execution. As such, Appellant was not entitled to injunctive relief. Erskine accepted the offer of employment as demonstrated by, *inter alia*, his undertaking of a pre-employment drug screening on March

2, 2016, as well as his resignation of his then-current employment.[6] Therefore, he was an employee of Appellant when he attended orientation and new-hire training at Appellant's headquarters, prior to presentation of the non-compete agreement on March 21, 2016. Appellant failed to demonstrate that Erskine's employment was contingent upon execution of the non-compete agreement, as demonstrated by the contents of the February 22, 2016 offer letter.[7] As Appellant's employee, Erskine was not offered new consideration at the time he was asked to execute the non-compete agreement and, as such, the agreement was not enforceable. Therefore, we concur with, and the record supports with apparently reasonable grounds, the trial court's determination that Appellant was not entitled to injunctive relief against Erskine because the non-compete agreement was not enforceable. **Pulse Technologies**, 67 A.3d at 781; **see also Pittsburgh Logistics**, 249 A.3d at 932. In light of this conclusion, we need not consider the remaining claims

_____

[6] It may be inferred from the offer letter's extension of relocation financial assistance that Erskine also relocated his residence as part of his new employment with Appellant. **See** N.T., 3/22/21, at Exhibit 1.

[7] Erskine's non-compete agreement states that as of March 21, 2016, the date the agreement was executed, Appellant "currently employees [Erskine] as an at-will employee in the position of Assistant Branch Manager[.]" N.T., 3/22/21, at Exhibit 2. Although the non-compete agreement states that "[Erskine] understands that this agreement is required as a condition of hire[,]" Erskine was already an employee of Appellant at the time he executed the document. **Id.**

raised in Appellant's third, fourth, and fifth issues insofar as they pertain to Erskine.

We now address the enforceability of Harmon's 2012, and 2016, non-compete agreements. Here, Appellant asserts that Harmon's agreements, although executed while she was already employed by Appellant, were support by "new consideration" in the form of an increase in salary and a promotion. Appellant's Brief at 29. Specifically, Appellant contends that, "as consideration for her execution of [the non-compete agreements,] Harmon received a salary increase more than two percent greater than any typical salary increase she received during her employment with [Appellant]." *Id.*

Concerning Harmon's 2016 non-compete agreement, the trial court found that Appellant failed to prove that the promotion and pay increase Harmon received in 2016, served as consideration for her subsequent execution of the 2016 non-compete agreement. Trial Court Opinion, 4/26/21, at 4. Rather, the trial court found that Harmon's change in position was a lateral move and not a promotion, and that the pay increase she received "was similar to pay increases she received in other annual reviews." *Id*.

The record demonstrates that, on February 10, 2016, Appellant extended Harmon an offer to become the assistant branch manager of quality at Appellant's Middletown, Pennsylvania branch. N.T., 3/17/21, at Exhibit 8. Harmon stated that she understood this offer to be for a position that she considered a lateral move since she presently served as the assistant branch manager of operations at Appellant's King of Prussia, Pennsylvania branch.

- 12 -

*Id.* at 22-23, 26 (stating, the only real difference between the two positions was that one dealt with operations and the other quality, as well as the change in office locations). Harmon accepted the offer on February 12, 2016, and the projected start date of her new position was March 28, 2016. *Id.* at Exhibit 8. According to the offer letter, during the period of February 22, 2016, through March 25, 2016, Appellant was designated the quality assistant branch manager in training. *Id.* Harmon testified that, during her training for this new position, she was presented with, and executed, the March 21, 2016 non-compete agreement. *Id.* at 24-25. Harmon stated that, at the time she executed the March 21, 2016 non-compete agreement, she believed that she already transitioned to, and assumed the position of, assistant branch manager of quality and was simply undergoing necessary training for the position. *Id.* at 73-74. In accepting the position of assistant branch manager of quality, the record demonstrates that, Harmon received an increase in her pay rate. The offer letter for the new position states that, as assistant branch manager of quality, Harmon would be compensated at a rate of $60,000.00 annually, which was an increase above the compensation she received as part of her prior position of assistant branch manager of operations. *Compare* N.T., 4/15/21, at Exhibit 8 *with id.* at Exhibit 34; *see also* N.T., 4/15/21, at 130-131.

These facts do not demonstrate that Harmon's execution of the March 21, 2016 non-compete agreement was ancillary to Harmon's offer and acceptance of a new position, which included a pay rate increase. A review of

the February 10, 2016 offer letter does not reference the execution of a non-compete agreement as a condition precedent to Harmon becoming the assistant branch manager of quality. *See* N.T., 4/15/21, at Exhibit 8. When Harmon received the non-compete agreement for execution, she had already accepted the new position and was engaged in training for the new position. Moreover, the March 21, 2016 non-compete agreement states that, at the time Harmon executed the agreement, "[Appellant] employs [Harmon] as an at-will employee in the position of Assistant Branch Manager [of] Quality[.]" Therefore, we concur with, and the record provides apparently reasonable grounds to support, the trial court's determination that the March 21, 2016 non-compete agreement was unenforceable because it was not ancillary to Harmon's new position and was not supported by new consideration.

Because the March 12, 2016 non-compete agreement was unenforceable,[8] we turn now to the November 30, 2012 non-compete agreement that Harmon executed to see if that agreement were supported by consideration and, thus, enforceable. The trial court found that the November 30, 2012 agreement was supported by consideration. Trial Court Opinion, 4/26/21, at 4-5. We agree.

_____

[8] Although the 2016 non-compete agreement stated that the agreement superseded all prior agreements, the 2016 non-compete agreement also included a severability clause which stated that if any portion of the agreement was found to be unenforceable, then that portion of the agreement was considered to be removed from the agreement. N.T., 3/17/21, at Exhibit 9 ¶¶11, 18.

The record demonstrates that, on November 12, 2012, Harmon was offered the position of field superintendent of Appellant's King of Prussia branch. N.T., 4/15/21, at Exhibit 6. The projected start date of the position was December 3, 2012. Harmon testified that she understood that, in conjunction with accepting this new position, she was required to execute a non-compete agreement.[9] N.T., 3/17/21, at 15. Before undertaking her new position, Harmon executed a non-compete agreement on November 30, 2012. Therefore, we concur with, and the record supports, the trial court's determination that the November 30, 2012 non-compete agreement was supported by new consideration and, therefore, enforceable. We, therefore, consider Appellant's third issue regarding whether injunctive relief was warranted with respect to Harmon's alleged breach of the November 30, 2012 non-compete agreement.

In its third issue, Appellant argues that the trial court "ignored the relevant facts and applied the incorrect legal standard" in determining that Appellant failed to demonstrate immediate and irreparable harm.[10]

_____

[9] Prior to accepting the position of field superintendent, which was a salaried position, Harmon held the positions of crew member, crew leader, advanced crew leader, specialty equipment operator, and a quality assurance role, all of which were paid-hourly positions. N.T., 3/17/21, at 8; **see also** N.T., 4/15/21, at Exhibits 33 and 34.

[10] We disagree with the trial court's suggestion in its Rule 1925(a) opinion that Appellant waived its challenge to the trial court's determination that Appellant failed to demonstrate immediate and irreparable harm resulting from Harmon's actions for failure to raise this issue in its Rule 1925(b) statement.

Appellant's Brief at 33. Relying on our Supreme Court's decision in ***John G. Bryant Co. v. Sling Testing & Repair, Inc.***, 369 A.2d 1164 (Pa. 1997), Appellant contends that the possible consequences of Harmon's unwarranted interference with Appellant's customer relationships is unascertainable harm that is not capable of being fully compensated by money damages and, thus, constitutes immediate and irreparable harm. Appellant's Brief at 33-34. Appellant asserts,

> Given the significant knowledge of [Appellant's] operations and customers Harmon [] gained during [her] employment with [Appellant], and the relationships [she] developed there, it is evident that [her] employment with [Appellant's] direct competitor and the position[ she holds] with that company creates a substantial risk of interference with [Appellant's] customer relationships and the harm contemplated by [***Sling Testing***, ***supra***,] and entitles [Appellant] to equitable relief.

Appellant's Brief at 34-35.

In ***Sling Testing***, our Supreme Court held that, within the context of a restrictive covenant incident to an employment relationship, immediate and

---

***See*** Trial Court Opinion, 9/8/21. A review of Appellant's Rule 1925(b) statement demonstrates that Appellant sufficiently raised, albeit without using the words "immediate" and "irreparable," a challenge to the trial court's determination that Appellant failed to prove harm resulting from Harmon's alleged violation of the non-compete agreement. ***See*** Appellant's Rule 1925(b) Statement, 9/1/21, at ¶e (stating, "[t]he trial court erred in determining that [] Appellant was required to produce 'proof' at the preliminary injunction stage of Harmon's actual use of Appellant's confidential information or of Harmon's solicitation of Appellant's customers and employees in order to have an actionable right. Appellant had a right to enforcement of its restrictive covenants to protect its legitimate business interests, which include its confidential information and its relationship with employees and customers." (extraneous capitalization omitted)).

irreparable harm may be sufficiently demonstrated when it has been proven that actual damages, *i.e.,* loss of commission, have resulted from a breach of the restrictive covenant coupled with the potential for interference with customer relationships stemming from the continuing violation. ***Sling Testing***, 369 A.2d at 1167. Our Supreme Court explained,

> It is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention.
>
> . . .
>
> The covenant seeks to prevent more than just the [actual damages] that might result by the prohibited contact but also the covenant is designed to prevent a disturbance in the relationship that has been established between [employers] and their accounts through prior dealings. It is the possible consequences of this unwarranted interference with customer relationships that is unascertainable and not capable of being fully compensated by money damages.

*Id.* at 1167-1168 (noting, "[t]he possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available").

A preliminary injunction will not generally be granted "unless the plaintiff's right [of recovery] is clear and the wrong is manifest[.]" ***New Castle Orthopedic Assocs. v. Burns***, 392 A.2d 1383, 1384-1385 (Pa. 1978) (stating that, relief in the form of a preliminary injunction is limited to

instances where "a subsequent award of damages would be inadequate to compensate the loss suffered by a plaintiff who has *prima facie* established a clear right of recovery"). It is well-established that "the threshold evidentiary requirement that must be met before a preliminary injunction may be issued[ is] actual proof of irreparable harm." **Burns**, 392 A.2d at 1387, *relying on* **Herman v. Dixon**, 141 A.2d 576 (Pa. 1958); **see also Greenmoor, Inc. v. Burchick Constr. Co., Inc.**, 908 A.2d 310, 314 (Pa. Super. 2006) (stating, "a plaintiff must present 'concrete evidence' demonstrating 'actual proof of irreparable harm[' and] plaintiff's claimed 'irreparable harm' cannot be based solely on speculation and hypothesis" (citations omitted)) . The **Burns** Court explained that the principle established in **Sling Testing** supplemented the **Herman** threshold evidentiary principle "[w]here the plaintiff's proof of injury, although small in monetary terms, foreshadows the disruption of established business relations which would result in incalculable damage should the competition continue in violation of the covenant." **Burns**, 392 A.2d at 1387; **see also West Penn Specialty MSO, Inc. v. Nolan**, 737 A.2d 295, 299 (Pa. Super. 1999) (stating, "[t]he effect of [a] disruption [of established business] may manifest itself in a loss of new business not subject to documentation, the quantity and quality of which are 'inherently unascertainable'").

Here, in denying Appellant's request for injunctive relief, the trial court found that Appellant "failed to show what immediate and irreparable harm [it] suffered by [Harmon's] alleged violation of the agreement." Trial Court

Opinion, 4/26/21, at 6. The trial court further explained that, "[i]nstead, [Appellant] demonstrated [it] became aware of rumors and innuendo involving Harmon [] which ultimately has failed to prove actionable." *Id.* at 7. Specifically, the trial court found that Appellant failed to demonstrate that Harmon used confidential information she may have learned while employed by Appellant for the benefit of TMI or that Harmon violated the non-compete agreement by soliciting Appellant's customers or employees after she became employed by TMI. *Id.* at 6-7.

Our review of the record reveals apparently reasonable grounds to support the trial court's determination that Appellant failed to demonstrate immediate and irreparable harm and, therefore, was not entitled to injunctive relief. At the evidentiary hearing, Harmon explained that her understanding of Appellant's and TMI's businesses was that they were direct competitors in the temporary traffic control services market in the Mid-Atlantic region. N.T., 3/17/21, at 51-52. Harmon explained that although several of Appellant's clients contacted her after she left her employment with Appellant, her role at TMI was one of ensuring work-site safety and that she was not involved in TMI's business development or sales, and she did not solicit business from Appellant's clients on behalf of TMI. *Id.* at 53-76. Harmon further testified that TMI already had an established training program when she was hired and that she did not participate in training. *Id.* at 48-49.

Appellant's organizational development and training manager testified that he had no knowledge or evidence demonstrating that Harmon took

Appellant's training materials with her when she left her employment with Appellant or that she was a trainer in her current role at TMI and utilized Appellant's training materials. N.T., 3/22/21, at 44. Appellant's vice president of business development stated that he was unable to provide evidence that Harmon had approached, or was continuing to approach, Appellant's clients on behalf of TMI.[11] N.T., 4/15/21, at 32. Appellant's senior manager of business development also testified that he was unable to produce evidence that Harmon solicited business from Appellant's client pool. *Id.* at 64-65, 67. Finally, Appellant's vice president of human resources testified that she had no personal or tangible evidence that Harmon solicited Appellant's employees or clients or that Harmon retained confidential information obtained from Appellant that she now used on behalf of TMI. *Id.* at 120-127. When asked what irreparable harm Appellant suffered, the vice president of human resources described the harm as the **potential** loss of a client and the revenue generated from that client, if the business relationship were to end. *Id.* at 117.

_____

[11] In terms of specific evidence, the vice president of business development stated that his only knowledge of an instance where TMI had contact with one of Appellant's clients was *via* a job proposal submitted by TMI to that client in which TMI's price for services was less than the proposal submitted by Appellant. N.T., 4/15/21, at 35-36. The vice president of business development did not state, however, that Harmon had been in contact with the client or had been involved with preparing the job proposal. *Id.* To the contrary, Appellant's vice president of human resources speculated that Erskine was involved in preparing TMI's job proposal. *Id.* at 115-116.

We concur with, and the record supports with apparently reasonable grounds, the trial court's determination that Appellant failed to demonstrate the threshold evidentiary requirement of actual proof of immediate and irreparable harm in the form of a violation of Harmon's non-compete agreement. Without proof of actual injury *vis-à-vis* a violation of the non-compete agreement by Harmon, the principle set forth in **Sling Testing** is of no avail because a finding of actual injury, regardless of how minimal, is necessary, initially, to find that incalculable damages may exist as a result of, or arise from, the disruption of established business relationships. Therefore, we discern no abuse of discretion or error of law in the trial court's finding that, because Appellant failed to demonstrate that Harmon violated the non-compete agreement, it was not entitled to injunctive relief.[12]

_____

[12] In light of our disposition herein, we do not address Appellant's fourth issue alleging that the restrictive covenants were not overbroad in geographic terms. Nonetheless, we discern the trial court erred as a matter of law in finding the non-compete agreements were unenforceable because, *inter alia*, they contained an overly broad geographic limitation. **See** Trial Court Opinion, 4/26/21, at 5-6. A trial court may grant injunctive relief based upon an otherwise enforceable non-compete agreement so long as it reduces the scope of an overly broad geographic limitation. **Sidco Paper Co. v. Aaron**, 351 A.2d 250, 255 (Pa. 1976) (noting that, injunctive relief may be granted against a breach of a restrictive covenant once the overly broad geographic limitation of the covenant is limited to "a territory in which [the] defendant had been employed"); **see also Quaker City Engine Rebuilders, Inc. v. Toscano**, 535 A.2d 1083, 1089 (Pa. Super. 1987) (stating that, a restrictive covenant that is broader than necessary to protect the plaintiff may be enforceable once the trial court curtails the covenant to reasonable geographic limitations).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/19/2022

_____

Here, Appellant agrees that Harmon's November 30, 2012 non-compete agreement should be limited to the Mid-Atlantic region and that the inclusion of the Great Lakes region and Rocky Mountains region resulted in overly broad geographic limitations. Appellant's Brief at 31. The trial court found that the geographic limitations imposed by Harmon's non-compete agreement were not appropriate and, therefore, the restrictive covenant was unenforceable because the covenant would "keep Harmon from now being employed in Pennsylvania, Maryland, Delaware, New Jersey, Virginia, West Virginia[,] and North Carolina[,]" which the trial court stated, "contains probably 1/6[th] the population of the United States." Trial Court Opinion, 4/26/21, at 5-6. The trial court explained that the restrictive covenant prohibits Harmon from performing duties on behalf of TMI in "'any' place [Appellant] provided services while [Harmon was] employed; not the areas in which [Harmon] was working or even had ever worked, but any place anyone [employed by Appellant] has ever performed services." *Id.* at 5. In so stating, the trial court recognized that, although the geographic limitations of Harmon's non-compete agreement were overly broad, the geographic limitations could have been curtailed to that area in which Appellant provided services and in which Harmon worked while she was employed by Appellant, thus restricting her from working on behalf of TMI in those areas in which she would have developed customer relationships with Appellant's clients. Therefore, the trial court erred as a matter of law in finding that the non-compete agreement was unenforceable due to the overly broad geographic limitations because the trial court could have curtailed the restrictive covenant to reasonable geographic limitations. *Sidco Paper*, 351 A.2d at 255.