J-S22034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JUSTIN CARLSON AND REBECCA LOMBARD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1675 MDA 2024 |
| MICHELLE GRAZIANO, CHILDREN HOSPITAL OF PHILADELPHIA, SUSQUEHANNA COUNTY CHILDREN AND YOUTH SERVICES, UNKNOWN CHOP ADMINISTRATOR, AND UNKNOWN CHOP SOCIAL WORKER | : | |

Appeal from the Order Dated October 16, 2024
In the Court of Common Pleas of Susquehanna County Civil Division at
No(s):  2024-0612-CP

BEFORE:   LAZARUS, P.J., BOWES, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 06, 2026**

Justin Carlson and Rebecca Lombard (collectively, "Appellants") appeal *pro se* from the October 16, 2024 order that denied (1) their September 2024 petition for injunctive relief and (2) their motion for reconsideration of the court's prior decision to dismiss their August 2024 emergency petition for special relief.  We affirm the order as it pertains to the denial of Appellants' September petition.  However, we quash the appeal insofar as if challenges the denial of their motion for reconsideration of the court's decision to dismiss their August petition for injunctive relief.

———————————————

[*] Former Justice specially assigned to the Superior Court.

This case stems from the investigations conducted by the Susquehanna County Children and Youth Services ("CYS"), which resulted in CYS taking temporary emergency protective custody of Appellants' infant daughter, V.C. (born in August 2024). Specifically, the day after V.C.'s birth, CYS received a general protective services report from Wayne Memorial Hospital ("Wayne") that Ms. Lombard had not received prenatal care and that Appellants ignored the hospital's recommendation that V.C. remain at Wayne an additional week for observation ("Wayne referral"). Based thereupon, CYS offered services to Appellants, but they refused assistance.

Not long after, V.C. was transferred to Children's Hospital of Philadelphia ("CHOP") from another emergency facility to receive treatment for severe jaundice. A social worker from CHOP contacted Wayne for more information and learned of the open case and report. As a result, the social worker called CYS, and CYS asked her to submit a second ChildLine report ("CHOP referral"), which was classified as a near-fatality child abuse report.

Utilizing the CHOP referral, CYS orally applied for emergency protective custody of V.C. on August 12, 2024. As recalled by the judge at a subsequent hearing: "I was told that the child was being denied medical care and there was a threat of death. That's - - I mean, that's simplified in terms of what they were saying." N.T. Hearing, 8/14/24, at 68. The juvenile court orally granted the application immediately. In executing the oral shelter care order that evening, hospital security and police forced Appellants to leave CHOP in handcuffs, and CHOP threatened them with trespass charges if they returned.

- 2 -

The next morning, Appellants attempted to locate the shelter care order in the juvenile court division, but were unable to do so as it had not yet been reduced to writing. Therefore, they filed in the civil division an emergency petition for special injunctive relief, claiming, *inter alia*, that CYS had kidnapped V.C. and was preventing Appellants from making medical decisions on V.C.'s behalf. Appellants asked the court to issue a preliminary injunction without notice or hearing, pursuant to Pa.R.Civ.P. 1531, that would, among other things, direct CHOP and CYS to stop interfering with their access to V.C. and right to make medical decisions on her behalf, and allow Appellants to return to CHOP without threat of criminal charges being filed against them.

Later that same day, CYS submitted a written shelter care application and the court reduced its oral order to writing, in compliance with Pennsylvania Rule of Juvenile Court Procedure 1210.[1] In the application, CYS included concerns from the Wayne referral. It also indicated that V.C. was in need of medical intervention from CHOP because her organs were shutting down, and Appellants had asked to cease some medications and denied permission for further testing, which imperiled V.C.'s life. It verified as true and correct the allegations supporting the request, as required by Rule 1240(b)(7) (mandating that every application include, *inter alia*, "a

---

[1] Rule 1210 allows oral applications and orders in specific circumstances met here. **See** Pa.R.J.C.P. 1210(a), (b)(3) (effective 10/1/15 to 6/30/25) (providing, respectively, that "[t]he application for a court order of protective custody may be orally made; however, the request shall be reduced to writing within twenty-four hours[,]" and the order may be oral, so long as "it is reduced to writing within twenty-four hours or the next court business day").

verification by the applicant that the facts set forth in the petition are true and correct to the applicant's personal knowledge, information, or belief, and that any false statements are subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities").

The trial court consolidated the petition for injunctive relief and shelter care application for a hearing on August 14, 2024.[2]  At the hearing, Appellants confirmed their awareness that the court could appoint counsel to represent them if they desired, but they chose to proceed *pro se*.  The court first conducted the shelter care portion of the hearing.  CYS presented three witnesses:  V.C.'s neonatologist, a CHOP social worker, and the director of CYS.  The testimony from the first two witnesses belied the averments in the shelter care application.  Specifically, there was no evidence that V.C.'s organs had been shutting down or that Appellants had interfered with her medical care at CHOP.  *See* N.T. Hearing, 8/14/24, at 71 (CHOP's social worker testifying that "[i]n this courtroom today is the first time I'm hearing anything about organs shutting down.  But I don't know if that might have been misconstrued based on the intake person"); *id*. at 43 (doctor testifying that Appellants did not interfere with V.C.'s care in any manner).  Therefore, CYS withdrew its shelter care request and the court vacated the emergency protective custody order.

---

[2] The shelter care application proceeded in the juvenile court division, while the petition was filed in the civil division.  Regardless, the same judge consolidated and heard both matters.  For ease of discussion, we will, from this point forward, refer to both the juvenile and trial courts as the trial court.

The trial court declined to hold a hearing on the request for a preliminary injunction, instead dismissing it as moot because Appellants' custody of V.C. had been restored and the court "[wa]s no longer intervened[.]" N.T. 8/14/25, at 82. Appellants asked the court to nonetheless provide relief on its claims pertaining to threats of trespass at CHOP and for copies of the referring reports. The court stated it had no jurisdiction over CHOP, but confirmed with CHOP's attorney that the restriction was premised upon the custody order and, having restored Appellants' rights, that no longer served as a basis to restrict Appellants' access to CHOP. While the court indicated that Appellants could not access the reports, CYS explained that it was still conducting its investigation into the CHOP referral and would provide Appellants the pertinent paperwork.

Instead of appealing the order dismissing the petition as moot, Appellants filed a motion for reconsideration on August 23, 2024. The court scheduled a hearing for October 15. Meanwhile, CYS continued their investigation of suspected child abuse based upon the CHOP referral. On September 9, Appellants filed a motion to compel CYS to produce all child abuse reports, which the court added to the scheduled October hearing. One week later, Appellants filed a new motion for a preliminary injunction without notice or hearing, pursuant to Rule 1531, against CYS and CHOP. Although they requested a prompt disposition, the court scheduled this motion to be heard with the other two on October 15.

At the beginning of that hearing, CYS supplied the requested reports and informed that it had deemed the child abuse investigation based upon the CHOP referral to be unfounded. It also provided a new general protective services report that had been filed against Appellants the week prior due to concerns that they would not complete V.C.'s recommended follow-up medical care. As to the remaining motions, the court heard testimony from Mr. Carlson and the director of CYS. After presenting closing argument, Appellants orally moved for the court's recusal. The court denied the recusal request and Appellants' remaining motions.

This appeal followed.[3] Both Appellants and the trial court have complied with their obligations pursuant to Pa.R.A.P. 1925. Appellants present the following in their statement of questions:

_____

[3] The path to our present disposition was winding. Although the timeliness of this appeal will be discussed at length *infra*, we deem it prudent to summarize the manner in which it reached us. To that end, Appellants simultaneously filed separate notices of appeal in both the civil and juvenile dockets to the Commonwealth Court. Our sister court transferred the appeals to this Court. Appellants asked this Court to consolidate the instant appeal, which is from the order denying their requests for injunctive relief, with the appeal relating to the shelter care order, which was docketed at 1676 MDA 2024. In the application to consolidate, Appellants advised that the CHOP defendants have no interest in the civil appeal. *See* Pa.R.A.P. 908 ("All parties to the matter in the court from whose order the appeal is being taken shall be deemed parties in the appellate court, unless the appellant shall notify the prothonotary of the appellate court of the belief of the appellant that one or more of the parties below have no interest in the outcome of the appeal."). This Court denied the request to consolidate. As to the matter *sub judice*, the CHOP defendants, relying upon Appellants' averment in its application to consolidate the two appeals, indicated that they did not file a brief because they have no interest in the appeal. Finally, we *sua sponte* quashed the appeal
*(Footnote Continued Next Page)*

1. **Probable cause**. The trial court issued a verbal emergency protective custody order to [CYS] to take custody of Appellants['] infant child. This decision was made based on information provided by a CYS agent over an *ex parte* phone call. The agent had no personal knowledge and supplied no supporting witness affidavits or live witness testimony. Did the trial court have probable cause to issue the order to take custody of Appellants['] infant child?

2. **Child Abuse Reports**. Appellants were reported to CYS for their choice of prenatal care, no health insurance, not signing paperwork, leaving a hospital, bringing their child to a hospital, and not telling CYS the name of VC's future health care providers. In 23 Pa.C.S. § 6301 *et seq*. [t]he term "child abuse" shall mean intentionally, knowingly[,] or recklessly doing one of [ten] categories of harmful acts. Is any report received by CYS a valid child abuse report if it doesn't allege any nexus between a parent[']s actions and the child[']s condition, and/or it doesn't allege an action that fits one of the [ten] categories defined?

3. **Investigation of reports**. CYS took investigative actions against the Appellants pursuant to 23 Pa.C.S. § 6301 *et seq*. Section 6368, investigation of reports, defines the investigative actions an agency may take upon receipt of a report of suspected "child abuse." Is CYS authorized to take any investigatory actions without having a valid report of "child abuse" as statutorily defined?

4. **Irreparable Harm**. Appellants lost physical and legal custody of V.C. for roughly [forty-eight] hours. Appellants were handcuffed and forcibly removed from V.C. CYS made medical decisions on behalf of the Appellants. Would it constitute an irreparable harm if the aforementioned actions occurred without any statutory authority?

---

on the juvenile docket as untimely filed from the shelter care order. ***See*** Order (1676 MDA 2024), 4/3/25.

Appellants' brief at 3-5 (cleaned up).[4]

Preliminarily, CYS contends that the instant appeal is untimely as to the August order denying injunctive relief, and that the issues are moot. ***See*** CYS's brief at 5. We first address whether this appeal was timely filed. Appellants invoke our jurisdiction via 42 Pa.C.S. § 742 ("The Superior Court shall have exclusive appellate jurisdiction of all appeals from final orders of the courts of common pleas[.]"), and Pa.R.A.P. 311(a)(4) (providing that an appeal may be taken from "[a]n order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction"). In both their August and September petitions, Appellants sought preliminary injunctive relief pursuant to Pa.R.Civ.P. 1531, which states in pertinent part:

> (a) A court shall issue a preliminary or special injunction only after written notice and hearing unless it appears to the satisfaction of the court that immediate and irreparable injury will be sustained before notice can be given or a hearing held, in which case the court may issue a preliminary or special injunction without a hearing or without notice. In determining whether a preliminary or special injunction should be granted and whether notice or a hearing should be required, the court may act on the basis of the averments of the pleadings or petition and may consider affidavits of parties or third persons or any other proof which the court may require.

---

[4] Appellants' *pro se* brief is not a model of clarity. For example, these questions do not line up precisely with their arguments, in contravention of our Rules of Appellate Procedure. ***See*** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued[.]") Nonetheless, we are able to glean readily the issues they seek to raise on appeal. As will be detailed *infra*, the scope of our review of those issues has been narrowed in light of our quashal of a portion of their appeal.

Pa.R.Civ.P. 1531(a).

On August 14, 2024, at the conclusion of the shelter care hearing, the court summarily dismissed as moot Appellants' August petition. That order was immediately appealable as of right pursuant to Rule 311(a)(4), and Appellants had thirty days from August 14, 2024, to timely file a notice of appeal. *See* Pa.R.A.P. 311(a)(4). As detailed hereinabove, Appellants did not file a notice of appeal within that period. Instead, they pursued a motion for reconsideration. Although the trial court scheduled a hearing on the motion for October 15, 2024, it did not expressly grant reconsideration. Therefore, the motion did not toll the appeal period. *See Gardner v. Consol. Rail Corp.*, 100 A.3d 280, 283 (Pa.Super. 2014) ("[I]t is well-settled that a motion for reconsideration, unless expressly granted within the thirty-day appeal period, does not toll the time period for taking an appeal from a final, appealable order." (cleaned up)). By waiting for the court to dispose of the reconsideration motion, Appellants missed the appeal window for the dismissal of their August petition. Moreover, "an appeal will not lie from the denial of a motion for reconsideration." *J.P. v. J.S.*, 214 A.3d 1284, 1289 (Pa.Super. 2019) (cleaned up). As a result, we are compelled to agree with CYS that Appellants' challenges to the dismissal of the August petition are not properly before us in this appeal, and will not be addressed by this Court.[5]

_____

[5] Appellants' August petition, filed before the application and order were reduced to writing, challenged the ability of CYS to seize custody of V.C. based
*(Footnote Continued Next Page)*

Turning to mootness, although that "doctrine requires that an actual case or controversy exist at all stages of review, not merely at the time the complaint is filed[,]" we may overlook mootness in certain circumstances, including where "the conduct complained of is capable of repetition yet likely to evade review[.]" ***Int. of N.E.M.***, 311 A.3d 1088, 1094 (Pa. 2024) (cleaned up). We readily determine that this exception applies here because the issues "are clearly capable of repetition, yet evading appellate review." ***In re Petition to Compel Cooperation with Child Abuse Investigation*** ("***Petition to Compel***"), 875 A.2d 365, 370 (Pa.Super. 2005) (determining a mootness exception applied given the time restraints in child abuse investigations resulting in some parents being denied appellate review).

Having cleared those hurdles, we now address the merits of Appellants' preserved issues as we glean them from the argument section of their brief. Appellants first challenge the procedure surrounding CYS's exercise of emergency protective custody of V.C. They compare the instant matter to ***Petition to Compel***, and ***In re D.R.***, 216 A.3d 286, 294 (Pa.Super. 2019), which held that the protections of the Fourth Amendment and Article I, § 8 apply to home inspections conducted pursuant to the Child Protective Services Law ("CPSL"). They argue that the emergency protective custody order

---

solely upon an oral application and oral order. Although we accordingly will not address any challenges to that aspect of the underlying proceedings, we observe, as noted hereinabove, that it is allowed by Pa.R.Civ.P. 1210.

constituted a seizure of V.C., for which CYS needed to first establish probable cause. *See* Appellants' brief at 20-21. They contend:

> [T]he sole purpose of proper probable cause is to prevent such grave inconsistencies and situations as the one that occurred in this matter. Had a single witness, or even the Appellants been requested to join the *ex parte* phone call with the trial court, it's likely the oral application for protective custody would have been denied.

*Id*. at 26. In short, they posit that "[i]f probable cause is required to enter a home to observe a child, it is unquestionably required to seize that child from parental custody." Appellants' reply brief at 21.

Plainly, this issue implicates the juvenile docket, the quashed appeal at 1676 MDA 2024, and the August petition for injunctive relief, none of which is before us. To clarify, in addressing this issue, we are not assessing the propriety of the court's order granting emergency protective custody, nor the oral component of the underlying juvenile proceedings. Rather, we limit our focus to the argument raised in the September petition for injunctive relief that the CHOP referral did not provide CYS with probable cause to seek protective custody or initiate the child abuse investigation. In other words, we look at the limits on CYS's authority to apply for emergency protective custody upon receipt of a report of suspected child abuse.[6]

We consider this claim mindful the following legal principles:

> The Fourth Amendment to the Constitution of the United States protects people from unreasonable government intrusions into their legitimate expectations of privacy. Upon closing the door of

---

[6] The next issue centers upon the child abuse investigation.

one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society. The Fourth Amendment to the United States Constitution reads as follows:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

*Petition to Compel*, 875 A.2d at 373 (cleaned up). In *Petition to Compel*, we held as a matter of first impression "that the Fourth Amendment and Article I, [§] 8 apply to the CPSL and the regulations written to implement it." *Id*. at 376-77 (cleaned up). Specifically, that case addressed the portion of the CPSL "mandat[ing] a 'home visit' at least once during the investigation period[,]" which we found to clearly further the purpose of "inspect[ing] and investigat[ing] the home for any evidence of abuse." *Id*. at 374, 377.

Appellants interpret *Petition to Compel* as requiring probable cause for an agency to enforce an emergency protective custody order if the child is at home, and they argue that they should not be treated disparately because V.C. was seized at the hospital. *See* Appellants' reply brief at 21. Even if probable cause is needed to enter someone's home to execute an emergency protective order, we find the differing locations to be a significant distinction. The Fourth Amendment protects the privacy interests parents have in their home. Individuals simply do not have the same reasonable expectation of privacy in a hospital room.

- 12 -

Unlike in **Petition to Compel**, the appropriate constitutional provision implicated here is the due process clause of the Fourteenth Amendment. We have reiterated:

> [T]he right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause of the Fourteenth Amendment. Mindful of this fundamental right, our law presumes that parents are fit and make decisions in their children's best interest, absent factors such as abuse, neglect, or abandonment.

**K.W. v. S.L.**, 157 A.3d 498, 502–03 (Pa.Super. 2017) (cleaned up); **see also In re R.M.**, 790 A.2d 300, 305 n.8 (Pa. 2002) ("It is well settled that parents' interest in care and custody of their children is secured by the Fourteenth Amendment." (cleaned up)). This fundamental right is not encompassed within the privacy interests protected by the Fourth Amendment. Therefore, we decline to apply Fourth Amendment principles to seizures of one's child pursuant to the Pennsylvania Rules of Juvenile Court Procedure.

Nonetheless, we must still ascertain the limits on an agency's power in seeking such emergency relief. Our High Court has explained that "[a]lthough by design juvenile proceedings are characterized by a degree of informality and flexibility, where constitutionally protected interests are at stake, the Due Process Clauses of the United States Constitution impose a requirement of fundamental fairness." **In re R.M.**, 790 A.2d at 304–05 (cleaned up) (citing, inter alia, U.S. Const. amends. V, XIV § 1). In the dependency context, our Supreme Court ruled:

In light of the gravity of the parental interests involved and the limited imposition upon the government in terms of identifying factual circumstances of which it must have some awareness, and since the primary objective of notice is to ensure the opportunity for a meaningful hearing, . . . reasonable factual specificity is required in the dependency setting.

*Id*. at 305 (cleaned up).

Further, "[a] child may be taken into protective custody by court order when the court determines that removal of the child is necessary for the welfare and best interests of the child." Pa.R.J.C.P. 1210(b)(1) (effective 10/1/15 to 6/30/25). The Rules of Juvenile Court Procedure outline the procedure CYS must follow in seeking emergency protective custody:

**A. Filings.** A shelter care application may be oral or in writing. If oral, within twenty-four hours of exercising protective custody pursuant to Rule 1210, the county agency shall file a written shelter care application.

**B. Application contents.** Every shelter care application shall set forth:

(1) the name of the applicant;

(2) the name, date of birth, and address of the child, if known;

(3) the name and address of the child's guardian, or if unknown, the name and address of the nearest adult relative;

(4) the date that the child was taken into custody;

(5) a concise statement of facts in support of the allegation of dependency;

(6) a statement detailing family finding efforts and:

     (a) the reasonable efforts made to prevent placements; and

     (b) why there are no less restrictive alternatives available;

- 14 -

(7) a verification by the applicant that the facts set forth in the petition are true and correct to the applicant's personal knowledge, information, or belief, and that any false statements are subject to the penalties of the Crimes Code, 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities;

(8) the signature of the applicant and the date of the execution of the application; and

(9) the whereabouts of the child unless the county agency has determined it would pose a risk to the safety of the child or the guardian, or disclosure is prohibited by the court.

Pa.R.J.C.P. 1240 (effective 10/1/15 to 6/30/25).

Here, CYS advised the court in its oral application that V.C. "was being denied medical care and there was a threat of death." N.T. Hearing, 8/14/24, at 68. Based on these assertions, the court understandably granted the application for emergency protective custody. Within twenty-four hours, CYS submitted a written application, which included a verification of the truth and correctness of these claims pursuant to Rule 1240(b)(7). Appellants aver, however, that this application was based upon hearsay that the hearing proved "was factually vacant." Appellants' brief at 22-24. This assertion was borne out by the fact that CYS moved to withdraw the application during the subsequent hearing after testimony revealed that the information that had formed the foundation of the application was inaccurate. *See* N.T. Hearing, 8/14/24, at 81.

We fully recognize the importance of CYS acting with exigency to protect children from suspected child abuse and serious physical neglect. Certainly, investigations may appear meritorious at the time they are initiated and later,

thankfully, prove to be unfounded. CYS should not be penalized for acting in what they believe to be the child's best interests in those scenarios. Indeed, we have propounded that "[t]he purpose of the CPSL is to create an atmosphere which promotes a child protection mentality and a system which gives preference to over-investigating unfounded reports as opposed to one of under-reporting founded allegations." ***Commonwealth v. Coyne***, ____ A.3d ____, 2025 WL 2619297, at *12 (Pa.Super. 2025) (cleaned up).

Nevertheless, it is also true that CYS must not be permitted to seek emergency protective custody of a child premised upon false or baseless information. Even a swift response has to be grounded in fact to be legitimate. Stated plainly, "[t]he agency must articulate to the court the basis for its belief; it cannot simply assert the belief without explanation." ***Petition to Compel***, 875 A.2d at 380 (Beck, J., concurring); ***accord Mulholland v. Gov't Cnty. of Berks, Pa.***, 706 F.3d 227, 241 (3d Cir. 2013) (holding that "a child welfare agency abridges an individual's substantive due process rights when its actions exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed shocks the conscience[, such as when] the child is removed without an objectively reasonable suspicion of abuse, based on the information available at the time" (cleaned up)).

The concurrence's discussion in ***Petition to Compel*** of the interplay between agency responsibilities and the fundamental rights of parents is particularly salient:

I recognize the burdensome case loads agencies such as the one here face. I also recognize that these same agencies often are criticized for not doing enough to help a child in need. Failure to make a home visit to [e]nsure a child's safety is a frequent criticism in cases that turn tragic. Therefore, the frustration agency officials experience in carrying out their tasks must be immense. Nonetheless, it is critically important that we [e]nsure agencies act within the bounds of the Constitution. When an agency sets out for the court all of the information it has in support of a motion to compel, the constitutional concerns can be addressed and the agency's duties are met.

***Petition to Compel***, 875 A.2d at 380 (Beck, J., concurring).

In the matter *sub judice*, CYS set forth no basis for its oral application other than its own assertions from the Wayne referral and CHOP referral. Indeed, the statements it made to the court in seeking emergency protective custody turned out to be misconstrued from the information reported by CHOP. In the written application, CYS verified to the court the information it relied upon from those referrals in making the oral application, and included more details from the referrals. However, it apparently did so without subjecting the contents of the CHOP referral to any level of scrutiny. In other words, it appears that CYS blindly attested to the accuracy of the information it received without making any effort to confirm its veracity or proper understanding before seeking emergency protective custody. For example, at the hearing, V.C.'s attending neonatologist testified that "at no point did [Appellants] impair the medical care of [V.C.]" while at CHOP. ***See*** N.T. Hearing, 8/14/24, at 36, 43-44; ***see also id***. at 71 (CHOP's social worker testifying that CYS may have misconstrued the information CHOP provided to

reach the conclusion that V.C.'s organs were shutting down). Once it became obvious that the reality was significantly different than reported, CYS was compelled to move to withdraw the request for emergency protective custody. Accordingly, we hold that the shelter care application lacked even a minimum threshold level of reliability and the agency therefore acted in contravention of Rule 1240 in seeking emergency protective custody without confirmation of the contents of the CHOP referral.

As noted, the order granting the application for emergency protective custody has already been vacated and thus the prior order has effectively been "entirely destroyed[.]" *Fitzpatrick v. Fitzpatrick*, 811 A.2d 1043, 1045 (Pa.Super. 2002) (cleaned up). Nonetheless, we deem it important to expressly delineate the parameters of CYS's discretion in seeking emergency protective custody. As set forth herein, its discretion is not unfettered, but rather bound by the protections of our federal and state constitutions. That is, "[t]he agency must articulate to the court the basis for its belief[,]" *Petition to Compel*, 875 A.2d at 380 (Beck, J., concurring), with "reasonable factual specificity[,]" *In re R.M.*, 790 A..2d at 305 (cleaned up), and a truthful verification, as dictated by Rule 1240. *Accord Mulholland*, 706 F.3d at 241 (reiterating that the guarantees of substantive due process require that a child only be removed from a parent's care when there is "an objectively reasonable suspicion of abuse, based on the information available at the time" (cleaned up)). This approach balances the rights of parents and the duties of CYS, while furthering the purpose of the CPSL.

Next, Appellants claim that CYS lacked authority to initiate the child abuse investigation because the CHOP referral was not a valid report of child abuse.[7]  ***See*** Appellants' brief at 36, 44, 47-48 (citing 23 Pa.C.S. § 6368). The pertinent provisions of the CPSL are as follows:

> **(a) Response to direct reports.--**Upon receipt of a report of suspected child abuse by a perpetrator from an individual, the county agency shall ensure the safety of the child and any other child in the child's home and immediately contact the department in accordance with the provisions of [§] 6334 (relating to disposition of complaints received).
>
> **(b) Response to reports referred to county agency by department.--**Upon receipt of a report of suspected child abuse from the department, the county agency shall immediately commence an investigation and see the child within the following time frames:
>
> > (1) Immediately, if:
> >
> > > (i) emergency protective custody is required, has been or will be taken; or
> > >
> > > (ii) it cannot be determined from the report whether emergency protective custody is needed.
> >
> > (2) Within 24 hours of receipt of the report in all other cases.

23 Pa.C.S. § 6368.

Child abuse is defined thusly:

> **(b.1) Child abuse.--**The term "**child abuse**" shall mean intentionally, knowingly[,] or recklessly doing any of the following:

---

[7] Appellants argued in their August petition that the Wayne referral was not a valid child abuse report.  Since Appellants waived that issue by not timely filing a notice of appeal from the order dismissing their August petition, we do not consider this argument on appeal.

(1) Causing bodily injury to a child through any recent act or failure to act.

(2) Fabricating, feigning or intentionally exaggerating or inducing a medical symptom or disease which results in a potentially harmful medical evaluation or treatment to the child through any recent act.

(3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act.

(4) Causing sexual abuse or exploitation of a child through any act or failure to act.

(5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

(6) Creating a likelihood of sexual abuse or exploitation of a child through any recent act or failure to act.

(7) Causing serious physical neglect of a child.

(8) Engaging in any of the following recent acts:

    (i) Kicking, biting, throwing, burning, stabbing or cutting a child in a manner that endangers the child.

    (ii) Unreasonably restraining or confining a child, based on consideration of the method, location or the duration of the restraint or confinement.

    (iii) Forcefully shaking a child under one year of age.

    (iv) Forcefully slapping or otherwise striking a child under one year of age.

    (v) Interfering with the breathing of a child.

    (vi) Causing a child to be present at a location while a violation of 18 Pa.C.S. § 7508.2 (relating to operation of methamphetamine laboratory) is occurring,

provided that the violation is being investigated by law enforcement.

(vii) Leaving a child unsupervised with an individual, other than the child's parent, who the actor knows or reasonably should have known:

(A) Is required to register as a Tier II or Tier III sexual offender under 42 Pa.C.S. Ch. 97 Subch. H (relating to registration of sexual offenders), where the victim of the sexual offense was under 18 years of age when the crime was committed.

(B) Has been determined to be a sexually violent predator under 42 Pa.C.S. § 9799.24 (relating to assessments) or any of its predecessors.

(C) Has been determined to be a sexually violent delinquent child as defined in 42 Pa.C.S. § 9799.12 (relating to definitions).

(D) Has been determined to be a sexually violent predator under 42 Pa.C.S. § 9799.58 (relating to assessments) or has to register for life under 42 Pa.C.S. § 9799.55(b) (relating to registration).

(9) Causing the death of the child through any act or failure to act.

(10) Engaging a child in a severe form of trafficking in persons or sex trafficking, as those terms are defined under section 103 of the Trafficking Victims Protection Act of 2000 (114 Stat. 1466, 22 U.S.C. § 7102).

23 Pa.C.S. § 6303(b.1) (footnote omitted). "Serious physical neglect" is

further outlined as follows:

Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being,

causes bodily injury or impairs a child's health, development or functioning:

> (1) A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.
>
> (2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

23 Pa.C.S. § 6303(a).[8]

---

[8] Despite the initial reporting not being at issue here and Appellants not seeking criminal or civil liability against CYS, we render this memorandum cognizant of CYS's obligations in protecting children, and the preference for investigating unfounded reports over not reporting suspected child abuse. In that regard, we have explained an agency's responsibilities under the CPSL thusly:

> [Section] 6318 immunity is intended to encourage reporting of abuse by removing the fear of legal repercussions for those who comply with their reporting obligations. In contrast, § 6319 imposes strict requirements on mandated reporters to ensure that suspected abuse is promptly reported, and it holds them accountable through criminal penalties, including a second degree felony for multiple violations.

*Commonwealth v. Coyne*, ___ A.3d ___, 2025 WL 2619297, at *11 (Pa.Super. 2025). To that end, we have supported the following argument regarding the CPSL's purpose in granting authority to agencies in investigating suspected child abuse:

> There is nothing in the purpose of the Act or the text of the immunity provision which indicates it is intended to provide broad immunity to those who accept positions of authority with which they are required to decisively act with a bias towards providing protection and services, but who then inexcusably fail to fulfill the duties and obligations of their office.

*Id*. at *12 (cleaned up). We believe that our decision today accords with that interpretation and furthers the CPSL's purpose.

Presently, CYS initiated contact with Appellants after they left the birthing hospital, where V.C. was born at thirty-four weeks, earlier than "preferred from the medical team" and without arranging for a pediatrician outside the hospital.[9]  **See** N.T. Hearing, 8/14/24, at 60.  CYS was also concerned about the lack of prenatal care and health insurance, and Appellants' refusal to partake in certain blood tests and screenings.  When V.C. presented to CHOP in a near-fatal condition, CYS asked CHOP to make another ChildLine report based upon the new hospital admission, *i.e.*, the CHOP referral.  **Id**. at 70-73.  This report was characterized as a child protective services report based upon suspected medical neglect and V.C.'s near fatality.

Upon review, we agree with Appellants that these factors do not fall within the statutory definition of child abuse as CYS did not establish a causal nexus between Appellants' conduct and V.C.'s condition.  In fact, Appellants brought V.C. to the hospital to receive life-saving care, and despite their trepidation about the manner of how that care had to be given, they did not attempt to discharge her against the advice of the medical team nor ask them to cease any life-saving measures.  Having discussions about their concerns

_____

[9] As explained above, we are not assessing whether the claims in the Wayne referral amount to child abuse.  We consider them only insofar as they impact the CHOP referral.  In that regard, Wayne did not classify Appellants' choice to leave as being against medical advice.  However, CHOP interpreted Appellants' decision to leave the birthing hospital as being against medical advice.  **See** N.T. Hearing, 8/14/24, at 80.  Clearly, that classification is relevant to ascertaining the level of concern CYS placed on Appellants' actions.

does not amount to interference, but rather the attempt many parents would make to understand the appropriateness of the care their child is receiving. Accordingly, CYS lacked authority to initiate the CHOP referral investigation. However, we can provide no further remedy as it was already appropriately deemed unfounded,[10] and the related shelter care order vacated.

---

[10] The ramifications from an unfounded report are limited in scope:

> **(a) General rule.--**When a report of suspected child abuse is determined by the appropriate county agency to be an unfounded report, the information concerning that report of suspected child abuse shall be maintained for a period of one year. Following the expiration of one year after the date the report was received by the department, the report shall be expunged from the Statewide database, as soon as possible, but no later than 120 days after the one-year period following the date the report was received by the department, and no information other than that authorized by subsection (b), which shall not include any identifying information on any subject of the report, shall be retained by the department. The expunction shall be mandated and guaranteed by the department.
>
> **(b) Absence of other determination.--**If an investigation of a report of suspected child abuse conducted by the appropriate county agency pursuant to this chapter does not determine within [sixty] days of the date of the initial report of the instance of suspected child abuse that the report is a founded report, an indicated report or an unfounded report, or unless within that same [sixty]-day period court action has been initiated and is responsible for the delay, the report shall be considered to be an unfounded report, and all information identifying the subjects of the report shall be expunged no later than 120 days following the expiration of one year after the date the report was received by the department. The agency shall advise the department that court action or an arrest has been initiated so that the Statewide database is kept current regarding the status of all legal proceedings and expunction is delayed.

*(Footnote Continued Next Page)*

Finally, Appellants argue that the trial court erred in denying injunctive relief because they claim the preliminary injunction was necessary to prevent irreparable harm.[11]  **See** Appellants' brief at 49.  We consider this issue in light of the following:

> [O]ur review of a trial court's order granting or denying preliminary injunctive relief is highly deferential.  This highly deferential standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to examine the record to determine if there were any apparently reasonable grounds for the action of the court below.  We will find that a trial court had apparently reasonable grounds for its denial of injunctive relief where the trial court has properly found that any one of the following essential prerequisites for a preliminary injunction is not satisfied.
>
> There are six essential prerequisites that a party must establish prior to obtaining preliminary injunctive relief.  The party must show:  1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited to abate the offending activity; and, 6) that a preliminary injunction will not adversely affect the public interest. The burden is on the party who requested preliminary injunctive relief[.]

**Warehime v. Warehime**, 860 A.2d 41, 46-47 (Pa. 2004) (cleaned up).

---

23 Pa.C.S. § 6337.

[11] We reiterate that our review is limited to the September motion.

Here, the court denied Appellants' motion because it determined that their "requested injunctive relief would have undercut the statutory and regulatory framework that has been created to protect the [w]elfare and safety of children in the Commonwealth." Trial Court Opinion, 11/15/24, at 5. We agree. By way of further background, the second injunction request asked that the court: (1) deem the allegations of child abuse unfounded so that CYS would "ha[ve] no statutory authority to investigate [Appellants; (2) issue] a protection order against [various] CYS agents[; and (3) direct CYS] to provide all information contained in the [s]tatewide database and reports pertaining to this matter[.]" Emergency Motion for Injunctive Special Relief, 9/16/24, at 31-32.

At the beginning of the hearing, CYS turned over all reports and conveyed that it had deemed the CHOP referral unfounded. Since the requested relief had already been realized as to those two prongs, the trial court had reasonable grounds to deny the requested relief as it was no longer necessary. **See Warehime**, 860 A.2d at 46-47.

As to the remaining plea for a protection order against CYS, we do not take lightly Appellants' shock, anger, and frustration with being subjected to multiple investigations and an unsupported emergency protective custody application. The anguish resulting from being literally pulled away from one's infant child while she is undergoing significant medical intervention cannot be understated. Not only that, but Appellants were barred from V.C. for forty-eight hours under the threat of criminal arrest if they returned to CHOP, and

they had to resort to our courts to vindicate their constitutionally-protected parental rights. Although the trial court promptly scheduled a hearing, Appellants still were subjected to a significant period of lost time with V.C. The ineffable anxiety resulting from being unable to make decisions or even provide comfort to their newborn while she underwent extensive medical treatment can only truly be understood by those parents who have had to endure similar experiences. Moreover, we do not diminish the lasting impact of this ordeal and Appellants' resulting hesitance, once their rights were restored, of asking questions about V.C.'s treatment for fear of being taken away from her again.

However, a determination that a child abuse report is unfounded cannot operate to prevent CYS from conducting future investigations based upon **valid** referrals supporting a suspected child abuse investigation. To hold otherwise would undermine the purpose of the CPSL, which allows CYS to cast a wide, though not all-encompassing, net to fulfill its duty to protect children from abuse. **See Coyne**, 2025 WL 2619297, at *11-12.

As Appellants note, "[o]nly upon receiving a valid report of suspected child abuse would CYS be authorized to investigate . . . Appellants." Appellants' brief at 51. The relief they sought would have hindered that ability. Stated simply, injunctive relief barring CYS from being able to contact Appellants is not "reasonably suited to abate the offending activity[.]" **Warehime**, 860 A.2d at 47 (cleaned up). Here, the court had already provided the proper remedy by vacating the order granting emergency

protective custody.  Thus, Appellants have not established that the court did not have reasonable grounds for denying them injunctive relief.  Accordingly, we affirm.

Order affirmed.

President Judge Lazarus joins this Memorandum.

President Judge Emeritus Stevens files a Concurring Memorandum.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 02/06/2026